UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                          Chapter 11

BARKER BOATWORKS, LLC,                          Case No. 8:19-bk-03138-MGW

     Debtor.

_____/

**DISCLOSURE STATEMENT FOR PLAN OF LIQUIDATION
UNDER CHAPTER 11 OF THE UNITED STATES
BANKRUPTCY CODE FOR BARKER BOATWORKS, LLC**

Dated: May 24, 2019          **STICHTER, RIEDEL, BLAIN & POSTLER, P.A.**
Tampa, Florida               Amy Denton Harris
                             Florida Bar No. 634506
                             110 East Madison Street, Suite 200
                             Tampa, Florida 33602
                             Telephone:    (813) 229-0144
                             Facsimile:    (813) 229-1811
                             Email:        aharris@srbp.com
                             Counsel for Debtor and Debtor in Possession

THIS DISCLOSURE STATEMENT (THE "**DISCLOSURE STATEMENT**") MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE FOR BARKER BOATWORKS, LLC (THE "**PLAN OF LIQUIDATION**" OR THE "**PLAN**"), AND NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THE DESCRIPTION OF THE DEBTOR'S PLAN OF LIQUIDATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF.  **<u>EACH CREDITOR AND HOLDER OF AN INTEREST SHOULD READ, CONSIDER AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLAN.</u>**

THE SOLICITATION OF ACCEPTANCES OF THE PLAN OR THE GIVING OF ANY INFORMATION OR THE MAKING OF ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS OR DOCUMENTS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN IS NOT AUTHORIZED BY THE DEBTOR, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.  SUCH ADDITIONAL REPRESENTATIONS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, WHO IN TURN WILL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR ACTION AS MAY BE DEEMED APPROPRIATE.  THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.  CREDITORS AND HOLDERS OF INTERESTS ARE ENCOURAGED TO REVIEW THE BANKRUPTCY DOCKET IN ORDER TO EVALUATE EVENTS WHICH OCCUR BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE DATE OF THE CONFIRMATION HEARING. **<u>ALL CREDITORS THAT ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN OF LIQUIDATION AND THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT, PRIOR TO SUBMITTING A BALLOT PURSUANT TO THIS SOLICITATION.</u>**

IN THE EVENT THAT ANY OF THE CLASSES OF HOLDERS OF IMPAIRED CLAIMS VOTE TO REJECT THE PLAN (1) THE DEBTOR MAY ALSO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN WITH RESPECT TO THAT CLASS UNDER THE SO-CALLED "CRAMDOWN" PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE (11 U.S.C. §1129(b)) AND, IF REQUIRED, MAY FURTHER AMEND THE PLAN TO CONFORM TO SUCH REQUIREMENTS OR (2) THE PLAN MAY BE OTHERWISE MODIFIED OR WITHDRAWN AS PROVIDED THEREIN.  THE REQUIREMENTS FOR CONFIRMATION, INCLUDING THE VOTE OF HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN AND CERTAIN OF THE STATUTORY FINDINGS THAT MUST BE MADE BY THE BANKRUPTCY COURT, ARE SET FORTH UNDER THE CAPTION "VOTING ON AND CONFIRMATION OF THE PLAN."

APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN, NOR DOES SUCH APPROVAL CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

**THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND HOLDERS OF INTERESTS.  ALL CREDITORS AND HOLDERS OF INTERESTS ARE THEREFORE URGED TO VOTE IN FAVOR OF THE PLAN.**  TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED AND EXECUTED AND RECEIVED BY NO LATER THAN THE TIME SET BY THE COURT.

<u>EXHIBITS TO DISCLOSURE STATEMENT</u>

EXHIBIT A                          Liquidation Analysis

**DISCLOSURE STATEMENT FOR PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE FOR BARKER BOATWORKS, LLC**

BARKER BOATWORKS, LLC, as debtor and debtor in possession (the "**Debtor**"), submits this Disclosure Statement pursuant to Section 1125 (11 U.S.C. §1125) of the Bankruptcy Code, 11 U.S.C. §101, *et seq.* (the "**Bankruptcy Code**"), in connection with the solicitation of votes on the Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code for Barker Boatworks, LLC (the "**Plan**") from holders of impaired Claims against the Debtor and the hearing on confirmation of the Plan, as scheduled by the Bankruptcy Court.

This Disclosure Statement is subject to the approval of the Bankruptcy Court in accordance with Section 1125(b) of the Bankruptcy Code as containing information of a kind and in sufficient detail adequate to enable a hypothetical reasonable investor typical of the holders of Claims of the relevant Voting Classes (as defined below) to make an informed judgment whether to accept or reject the Plan.  Effort has been made to provide meanings of capitalized and other terms used in this Disclosure Statement.  Reference is made to the Plan, however, for the actual meanings of all capitalized and other terms used in this Disclosure Statement and in the Plan and for controlling language with respect to any provision referenced in this Disclosure Statement or in the Plan.  Terms used in this Disclosure Statement and in the Plan are defined in Article I of the Plan.  In the event of a conflict between the definition of any term or any other provision contained in this Disclosure Statement and the corresponding definition or provision contained in the Plan, the definition or provision contained in the Plan shall control.

In the opinion of the Debtor, the treatment of Claims and Interests under the Plan contemplates a substantially greater recovery than that which is likely to be achieved under other alternatives for the reorganization or liquidation of the Debtor.  **If the Plan is not confirmed, there is a substantial likelihood that unsecured creditors will be left with no recovery at all.**

The Debtor believes that confirmation of the Plan is clearly in the best interests of Creditors and Holders of Equity Interests, and strongly recommend that Creditors holding Allowed Claims in the Voting Classes vote to accept the Plan.

### PURPOSE OF DISCLOSURE STATEMENT

The purpose of this Disclosure Statement is to provide the Creditors of the Debtor with adequate information to make an informed judgment about the Plan.  This information includes, among other things, the history of the Debtor prior to the filing of the Bankruptcy Case under Chapter 11, the events leading to the filing of the Bankruptcy Case, a brief summary of significant events to date in the Bankruptcy Case, and a summary explanation of how the Plan will function.

This Disclosure Statement contains important information about the Plan and considerations pertinent to a vote for or against the confirmation of the Plan.  All holders of

Claims and Equity Interests are encouraged to carefully review this Disclosure Statement and the Plan.

**VOTING INSTRUCTIONS**

*Who May Vote*

Only the holders of Claims and Equity Interests that are deemed "allowed" under the Bankruptcy Code and that are "impaired" under the terms and provisions of the Plan (the **"Voting Classes"**) are permitted to vote to accept or reject the Plan. For purposes of the Plan, only the holders of Allowed Claims in the Voting Classes are impaired under the Plan and thus may vote to accept or reject the Plan. Under the Plan, the Claims classified in Classes 2A, 2B, 3, and 6 are impaired under the Plan and are entitled to vote to accept or reject the Plan and thus constitute the "Voting Classes" thereunder.

*How to Vote*

Each holder of a Claim in a Voting Class should read this Disclosure Statement, together with the Plan and other exhibits, in their entirety. After carefully reviewing the Plan and this Disclosure Statement and their respective exhibits, please complete the enclosed Ballot, including indicating your vote thereon with respect to the Plan, and return the Ballot as provided below. Please note that your vote and election cannot count unless you return the enclosed Ballot.

If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact Susan McKee at (813) 229-0144.

Completed Ballots should be sent by regular mail, hand delivery, or overnight delivery, **SO AS TO BE RECEIVED NO LATER THAN THE VOTING DEADLINE,** to:

Clerk of the United States Bankruptcy Court<br>Sam M. Gibbons United States Courthouse<br>801 N. Florida Avenue, Suite 555<br>Tampa, Florida 33602

or completed Ballots can be filed electronically through the Bankruptcy Court's website at: www.flmb.uscourts.gov and selecting "Electronic Filings" and "Chapter 11 Ballots".

A copy of the Ballot should also be sent to:

Amy Denton Harris, Esquire<br>Stichter Riedel Blain & Postler, P.A.<br>110 E. Madison Street, Suite 200<br>Tampa, Florida 33602

### *Acceptance of Plan and Vote Required for Class Acceptance*

As the holder of an Allowed Claim in the Voting Classes, your vote on the Plan is extremely important.  In order for the Plan to be accepted and thereafter confirmed by the Bankruptcy Court without resorting to the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code as to other classes of Allowed Claims, votes representing at least two-thirds in amount and more than one-half in number of Allowed Claims of each impaired Class of Claims that are voted must be cast for the acceptance of the Plan.  The Debtor is soliciting acceptances only from members of the Voting Classes.  The Debtor or its agents may contact you with regard to your vote on the Plan.

To meet the requirement for confirmation of the Plan under the "cramdown" provisions of the Bankruptcy Code with respect to any impaired Class of Claims or Equity Interests which votes to reject the Plan (a "**Rejecting Class**"), the Debtor would have to show that all Classes junior to the Rejecting Class will not receive or retain any property under the Plan unless all holders of Claims in the Rejecting Class receive, under the Plan, property having a value equal to the full amount of their Allowed Claims.

### *Confirmation Hearing*

The Bankruptcy Court will schedule a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), which may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.  The Bankruptcy Court has directed that any objection to confirmation of the Plan must be in writing and specify in detail the name and address of the objector, the basis for the objection and the specific grounds for the objection, and the amount of the Claim held by the objector.  Consistent with Rule 3020(b) of the Federal Rules of Bankruptcy Procedure and Local Rule 3020-1(a), any such objection must be filed with the Bankruptcy Court and served upon each of the following parties, so as to be actually received on or before the deadline set by the Court:

| | |
|---|---|
| Debtor: | Amy Denton Harris, Esquire<br>Stichter Riedel Blain & Postler, P.A.<br>110 East Madison Street, Suite 200<br>Tampa, Florida 33602 |
| U.S. Trustee: | Denise Barnett, Esquire<br>Assistant United States Trustee<br>501 East Polk Street, Suite 1200<br>Tampa, Florida 33602 |

### HISTORY OF THE DEBTOR

The Debtor is a custom boat builder headquartered in Sarasota, Florida.  The Debtor's administrative offices and showroom are located at 7910 25th Court E., Suite 115,

in Sarasota, Florida. The Debtor leases this space from 2550 TR, LLC. The Debtor's manufacturing/assembly and rigging facility is located at 2188 51st Street in Sarasota, Florida. This facility is leased from R.P.W. of Sarasota, Inc.

The Debtor is a Florida limited liability company established by Kevin Barker in 2014 to design and build the ultimate bay boat. Utilizing the expertise of world-renowned naval architect, Michael Peters, a management team with over 100 years of combined industry experience, and the best materials, technology, and methods available, the Debtor designs and builds custom bay boats, including the 26 Calibogue Bay, the 26 Open, and the 40 HPC. The Debtor and its experienced team of professionals have developed a reputation as an industry leader for their "Yacht Quality" fit, finish, and rigging. Between its formation in 2014 and the bankruptcy filing, the Debtor delivered 65 custom boats.

The Debtor's gross revenues for the year ending December 31, 2017, were approximately $3.2 million and its cost of goods sold was approximately $3 million resulting in gross profit of approximately $200,000. After operating expenses of approximately $1.2 million, the Debtor sustained a net loss of approximately $1 million. The Debtor's gross revenues for the year ending December 31, 2018, were approximately $2.6 million and its cost of goods sold was approximately $3.5 million resulting in a gross loss of approximately ($950,000). After operating expenses of approximately $700,000, the Debtor sustained a net loss of approximately $1.6 million.

### EVENTS LEADING TO THE FILING OF THE BANKRUPTCY CASE

After evaluating alternatives, the Debtor determined that a Chapter 11 filing would provide a venue in which to effectively address its current debts and best serve the interests of its creditors, customers, and employees. The Chapter 11 filing was precipitated by three primary events: (a) 4 years of defending non-meritorious litigation, which diverted Mr. Barker's attention and prevented the Debtor from accessing traditional sources for essential working capital; (b) a business model, which created a substantial cash flow problem; and (c) inability to access $1.5 million in prepetition working capital in lump sum.

Shortly after the Debtor's inception, Yellowfin Yachts, Inc. sued the Debtor and Kevin Barker in the United States District Court for the Middle District of Florida, Tampa Division (Case No. 8:15-cv-990-SDM) for trade dress infringement under Section 43(a) of the Lanham Act, false designation of origin under Section 43(a) of the Lanham Act, common law unfair competition, common law trade dress infringement, violation of Florida's Trade Secret Act, and civil conspiracy to violate Florida's Trade Secret Act. The litigation consumed approximately 4 years and concluded with a judgment in favor of the Debtor and Mr. Barker, which was affirmed on appeal. Unfortunately, the victory was hollow because the damage to the Debtor's and Mr. Barker's business and reputation had already been done. As a result of the litigation, the Debtor was unable to access working capital from traditional sources to operate its business and complete customer orders.

In addition, for the first three and a half years of the business, when the Debtor received an order from a customer for the purchase and construction of a custom boat, the

Debtor would take a deposit from the customer and the balance of the purchase price would be due upon completion. This created a substantial cash flow problem for the Debtor. In 2017, the Debtor adjusted its business model to require customers to provide progress payments in addition to the initial deposit.

In 2017, the Debtor obtained approximately $1.5 million from Barker Boatworks Investor Group, LLC to fund critical working capital needs. The funding was made in tranches over a period of several months instead of in a lump sum. Unfortunately, this increased the cost to complete boats in progress and delayed the completion of those boats.

During the three week period preceding the Petition Date, the Debtor lacked funding to pay payroll, insurance premiums, rent, and other critical operating expenses. Indeed, during this time, the Debtor received a three-day notice from one of its landlords. In order to preserve the going concern value of the company pending a longer-term solution, the Debtor entered into a transaction with Strike Force Seven LLC ("**SFS**")[1], pursuant to which SFS funded a total of $124,739.17 to the Debtor to pay payroll, insurance, rent, attorneys' fees and costs for filing the Chapter 11, and other essential operating expenses. No documents were signed in connection with the transaction.

### SIGNIFICANT EVENTS TO DATE IN THE BANKRUPTCY CASE

On April 5, 2019 (the "**Petition Date**"), the Debtor filed a Voluntary Petition for Relief under Chapter 11 of Title 11 of the United States Code. As of the Petition Date, the Debtor's assets were comprised primarily of office furniture and equipment, inventory, vehicles, machinery and equipment, and boat molds. The scheduled value of the Debtor's assets as of the Petition Date was approximately $1.35 million.

### *Debtor in Possession Financing*

On April 11, 2019, the Debtor filed an *Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001* (Doc. No. 13) (the "**DIP Financing Motion**") requesting authorization, among other things, to borrow up to $1.5 million of senior secured and superpriority basis financing from SFS in accordance with the terms of the DIP Financing Motion and the DIP Loan Documents. On April 18, 2019, the Bankruptcy Court entered an *Interim Order Granting Debtor's Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001* (Doc. No. 32) and authorizing, among other things, the Debtor to borrow up to $250,000 from SFS on the terms and conditions set forth in the DIP Loan Documents pending a final hearing on the DIP Financing Motion. On April 26, 2019, the Bankruptcy Court entered a Final *Order Granting Debtor's Emergency Motion for Authority to Obtain Postpetition*

---

[1] SFS is a Florida limited liability company owned 100% by Al Jarrell. Mr. Jarrell and his wife, Cynthia, invested $50,000.00 in Barker Boatworks Investor Group, LLC, which made an aggregate investment of $1.5 million in the Debtor prior to the Petition Date. Mr. Jarrell also owns Perry Composites, a vendor which supplied the Debtor with product prepetition. Perry Composites was owed $66,334.85 as of the Petition Date.

*Financing and Grant Senior Liens and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001* (Doc. No. 56) (the "**DIP Financing Order**") and authorizing, among other things, the Debtor to borrow up to $1.5 million from SFS on the terms and conditions set forth in the DIP Loan Documents.

To date, the Debtor has borrowed $475,000 (the "**DIP Loan Proceeds**") pursuant to the DIP Financing Order and the DIP Loan Documents. The DIP Loan Proceeds were utilized to purchase materials necessary to complete five (5) boats, which are at various stages of completion, to cover other operating expenses, including payroll, insurance, and rent, and the Carve-Out Expenses (as defined in the DIP Financing Order). The Debtor anticipates that it will complete one or two boats in progress prior to the Effective Date of the Plan.

### Sale of Substantially All the Debtor's Assets

The Debtor determined that it would be in the best interests of its creditors and the estate to maximize value through a sale of substantially all of its assets pursuant to Section 363 of the Bankruptcy Code. Absent such a sale, the Debtor will most likely be facing a liquidation under Chapter 7 of the Bankruptcy Code, which would achieve far less for creditors than a sale as a going concern.

Prior to the filing of the Bankruptcy Case, the Debtor received an offer from the Buyer to purchase substantially all of the assets of the Debtor in a sale transaction under Section 363 of the Bankruptcy Code. This offer was memorialized in the Letter of Intent (as defined in the Asset Purchase Agreement).

On April 29, 2019, the Debtor and SFS entered into an Asset Purchase Agreement, pursuant to which the Debtor agreed to sell to the Buyer, and the Buyer agreed to purchase from the Debtor, the Purchased assets pursuant to Sections 363 and 365 of the Bankruptcy Code free and clear of any and all Liens, Claims, and Encumbrances, excepting certain Assumed Liabilities and the Permitted Liens.

As set forth in the Asset Purchase Agreement, the consideration to be paid by the Buyer to the Debtor for the Purchased Assets shall be the sum of the following: (i) the cost to build the first five (5) boats on order (estimated to be One Million and 00/100 Dollars ($1,000,000.00)), (ii) the cost to build the next twenty-seven (27) boats on order (estimated to be Three Million Five Hundred Thirty Thousand and 00/100 Dollars ($3,530,000.00)), (iii) the 40' Cat boats tooling completion (estimated to be One Million and 00/100 Dollars ($1,000,000.00)), (iv) the 40' Cat boats production cost for eight (8) boats (estimated to be Two Million Seven Hundred Twenty Thousand and 00/100 Dollars ($2,720,000.00)), (v) the amount of the Assumed Liabilities (excluding, however, any Assumed Liabilities described in Section 2.3(c) of the Asset Purchase Agreement that are already included in subparagraphs (i)-(iv) above), (vi) the aggregate amount of any advances under the DIP Loan plus any other DIP Loan Obligations (excluding, however, any such advances that are already included in subparagraphs (i)-(iv) above), and (vii) an amount not to exceed Fifty Thousand and 00/100 Dollars ($50,000.00) representing the General Unsecured Creditor Carve-Out (collectively, the "**Purchase Price**"); provided, however, that the Purchase Price

shall be subject to downward adjustment to the extent that any amounts included in subparagraphs (i)-(iv) above relate to Existing Boat Contracts that are not converted into New Boat Contracts as provided in the Asset Purchase Agreement.  The actual amount of the Purchase Price shall be included in the Sale Order.  The Purchase Price shall be paid by the Buyer's performance of the New Boat Contracts as contemplated by Section 7.4 of the Asset Purchase Agreement, the Buyer's assumption and performance of the Assumed Liabilities, and the Buyer providing the DIP Loan, in each case as described in the Asset Purchase Agreement, and no portion of the Purchase Price shall be paid in cash (except for any advances to the Debtor under the DIP Loan, the amounts payable in cash described in Section 2.3 of the Asset Purchase Agreement, and the General Unsecured Creditor Carve-Out).

The Asset Purchase Agreement provides that the Buyer shall assume the future payment and performance of certain liabilities, as specifically described in Section 2.3 of the Asset Purchase Agreement.  All liabilities under, arising from, or relating to the Assumed Contracts listed on **Exhibit A** to the Assumed Contracts Motion with respect to (i) matters occurring thereunder on or after the Closing Date, and (ii) the Cure Claims constitute Assumed Liabilities pursuant to Article 2.3(a) of the Asset Purchase Agreement. All liabilities that are not Assumed Liabilities are excluded liabilities under the Asset Purchase Agreement.

As set forth on Schedule 7.4 to the Asset Purchase Agreement, the treatment of Existing Customers is set forth below:

A. All 40' Cat Existing Boat Contracts would be replaced with contracts that are priced to the current fair market value for such boats and shall be subject to the provisions of subsection C, below.

B. All Existing Boat Contracts for the 26' Bay and the 26' Open would be replaced with new contracts and be subject to the provisions of subsection C, below.

C. In respect of each of the 26' Bay, 26' Open and 40' Cat, customers that have boats on order as of the Closing and who elect to enter into a New Boat Contract with the Buyer will be required to elect one of the following scenarios:

a. Scenario 1: The customer would be permitted to utilize 100% of the customer's deposit and 100% of any progress payments made on the customer's current boat on order as of the Closing as follows: 50% of the deposit and 50% of any progress payments will be applied to the customer's boat on order as of the Closing. The customer would then have the option to (i) immediately order any 35+' boat and apply the remaining 50% balance of the customer's deposit and progress payments to such new order, or (ii) order any other Barker or Canyon Bay model (excluding the

11

Barker 26), up to 35' long, twelve (12) months after delivery of the boat on order as of the Closing and apply the remaining 50% balance of the customer's deposit and progress payments to such new order, or (iii) order a Barker 26 boat twenty-four (24) months after delivery of the boat on order as of the Closing and apply the remaining 50% balance of the customer's deposit and progress payments towards such new order. If either option is exercised by the customer, the second boat would be sold at the fair market value at the time of such exercise.

b. Scenario 2: The customer would be permitted to utilize 60% of the customer's deposit and 60% of any progress payments made on the customer's current boat on order as of the Closing, which amounts will be applied to the completion of such boat.

c. Scenario 3: The customer can choose to not complete its boat order and 100% of the customer's deposit and 100% of any progress payments made on the customer's current boat on order as of the Closing will be general unsecured claims in the Bankruptcy Case.

d. Each Existing Customer shall have until the Voting Deadline to elect Scenario 1, 2, or 3; provided, however, that the Buyer may, in its sole and absolute discretion, extend the time for an Existing Customer to elect Scenario 1 or 2 and enter into a New Boat Contract.  Any Existing Customer that fails to timely elect Scenario 1 or 2 shall be deemed to have elected Scenario 3.

e. Any Existing Customer electing Scenario 1 or 2 shall be an Accepting Customer and shall be deemed to have waived all Claims, including, without limitation, Priority Claims pursuant to Section 507(a)(7) of the Bankruptcy Code and Unsecured Claims including rejection damage claims as a result of the Debtor's rejection of such customer's Existing Boat Contract, against the Debtor, the bankruptcy estate, and the Liquidating Debtor, and shall not receive any distributions under the Plan.

f. Any Non-Accepting Customer is deemed to have elected Scenario 3, shall have an Allowed Class 1 Priority Claim in the amount of $3,025.00, with the balance of the claim treated in accordance with Class 6.

To date, seventeen (17) of the forty (40) Existing Customers have entered into new boat contracts pursuant to either Scenario 1 or Scenario 2.  The list of the Existing Customers that have entered into new boat contracts has been filed with the Bankruptcy Court at Doc. No. 92.  The Debtor reserves the right to amend the list and add additional Existing Customers that enter into new boat contracts.

Pursuant to the Bid Procedures Order, the Bankruptcy Court has established bidding procedures in connection with the sale by the Debtor of substantially all of its assets. The deadline by which any competing bids are to be submitted to the Debtor, its counsel, and the Office of the United States Trustee is **5:00 p.m. (Eastern Daylight Time) on June 7, 2019** (or such later date agreed to by the Debtor). If competing bids are received by the Bid Deadline, an Auction to determine the best and highest offer for the Purchased Assets will be held at **10:00 a.m. (Eastern Daylight Time) on June 11, 2019**, at the offices of Stichter, Riedel, Blain & Postler, P.A., 110 East Madison Street, Suite 200, Tampa, Florida 33602.

As provided for in the Bid Procedures Order, SFS was selected by the Debtor and approved by the Bankruptcy Court as the "stalking horse bidder" under the Bid Procedures. Accordingly, SFS shall be entitled to the Break-Up Fee under the circumstances provided for in the Bid Procedures Order and the Asset Purchase Agreement.

On April 29, 2019, the Debtor filed the Sale Motion and the Assumed Contracts Motion. In the Sale Motion, the Debtor has requested that the Bankruptcy Court enter the Sale Order and approve (i) the execution and delivery by the Debtor of the Asset Purchase Agreement, and (ii) the sale and purchase of the Purchased Assets and the other transactions contemplated by the Asset Purchase Agreement. In the Assumed Contracts Motion, the Debtor has requested that the Bankruptcy Court enter an Assumed Contracts Order and approve the assumption and/or assignment of certain executory contracts and/or unexpired non-residential real property leases to SFS, subject to the terms and conditions of the Asset Purchase Agreement, free and clear of any and all Liens, Claims, and Encumbrances. The Closing under the Asset Purchase Agreement is contemplated to occur in conjunction with the Effective Date of the Plan. A hearing on the Sale Motion shall be held before the Honorable Michael G. Williamson, Sam M. Gibbons United States Courthouse, 801 North Florida Avenue, Courtroom 8A, Tampa, Florida 33602 on **June 12, 2019 at 10:30 a.m.** (the "**Sale Hearing**").

The above is a brief summary of the material terms of the Asset Purchase Agreement, the Bid Procedures Order, the Sale Motion, and the Assumed Contracts Motion. Holders of Claims and Equity Interests are encouraged to read the Asset Purchase Agreement, and other relevant documents, in their entirety for a more detailed description. Each of these documents are on file with the Clerk of the Bankruptcy Court.

## SUMMARY OF PLAN OF LIQUIDATION

**Introduction**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize and/or liquidate for his own benefit and the benefit of his creditors. The formulation of a plan is the principal objective of a Chapter 11 case. In general, a Chapter 11 plan (i) divides claims and interests into separate classes, (ii) specifies the property that each class is to receive under such plan, and (iii) contains other provisions necessary to the reorganization and/or liquidation of the debtor. Chapter 11 does not require each Holder of a claim or interest to vote in favor of the plan in order for the

Bankruptcy Court to confirm the plan.  However, a plan must be accepted by the holders of at least one impaired class of claims (unless there are no impaired classes) without considering the votes of "insiders" within the meaning of the Bankruptcy Code.

The summary of the Plan contained herein addresses only certain provisions of the Plan.  As a summary, it is qualified in its entirety by reference to the Plan itself.  Upon Confirmation and the Effective Date, the Plan shall bind the Debtor, all of the Debtor's Creditors, and other parties in interest except as expressly set forth in the Plan.  TO THE EXTENT THAT THE TERMS OF THIS DISCLOSURE STATEMENT VARY OR CONFLICT WITH THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL CONTROL.

### Treatment of Administrative Expenses and Priority Tax Claims

*In General.*  Claims and Equity Interests will be treated under the Plan in the manner set forth in this Article 5. Except as otherwise specifically provided in the Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan will be in full and final satisfaction, settlement, release, extinguishment, and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests.

*Unclassified Claims.*  Each Holder of an Allowed Administrative Expense or an Allowed Priority Tax Claim will receive the treatment set forth in Article 3 of the Plan.

*Class 1: Allowed Priority Claims.*  Class 1 consists of all Allowed Priority Claims, including, without limitation, Allowed Priority Claims of Non-Accepting Customers pursuant to Section 507(a)(7) of the Bankruptcy Code.  Pursuant to Article 2.3(d) of the Asset Purchase Agreement, the Buyer shall pay all Allowed Class 1 Claims in full on the Effective Date.  Class 1 is Unimpaired and, therefore, is not entitled to vote to accept or reject the Plan.  Class 1 is presumed to have accepted the Plan.

*Class 2: Allowed Claims of SunTrust.*  Class 2 consists of all Allowed Claims of SunTrust.  The treatment of SunTrust's Allowed Claims shall be divided into two sub-classes as follows:

(a)    Class 2A consists of SunTrust's Allowed Claim in connection with a Lien on a 2014 Ford F250 VIN 1FT7W2BT8EEA96079. On account of its Allowed Class 2A Claim, SunTrust shall receive one of the following alternative treatments:

(1)    The Buyer has the option to acquire the 2014 Ford F250 VIN 1FT7W2BT8EEA96079, subject to the Buyer's assumption and payment of SunTrust's Allowed Class 2A Claim.  If the Buyer exercises this option, on the Closing Date, the Debtor shall grant, sell, assign, transfer and deliver to the Buyer all right, title and interest of the Debtor in, to and under the 2014 Ford F250 VIN 1FT7W2BT8EEA96079, subject to the Buyer's assumption and payment of SunTrust's Allowed Class 2A Claim, but free and clear

of any and all other Liens, Claims, and Encumbrances.  In such event, SunTrust's Allowed Class 2A Claim shall constitute an Assumed Liability pursuant to the Asset Purchase Agreement and the Buyer shall pay the Allowed Class 2A Claim pursuant to the agreement between the Buyer and SunTrust.

(2)    If the Buyer does not exercise the option set forth above, on the Effective Date or as soon as practicable thereafter, the Debtor shall surrender the 2014 Ford F250 VIN 1FT7W2BT8EEA96079 to SunTrust in full and final satisfaction of its Allowed Class 2A Claim.

(b)    Class 2B consists of SunTrust's Allowed Secured Claim in connection with a Lien on a 2014 Ford F150 VIN 1FTFW1EF7EFD05107.  On account of its Allowed Class 2B Claim, SunTrust shall receive one of the following alternative treatments:

(1)    The Buyer has the option to acquire the 2014 Ford F150 VIN 1FTFW1EF7EFD05107, subject to the Buyer's assumption and payment of SunTrust's Allowed Class 2B Claim.  If the Buyer exercises this option, on the Closing Date, the Debtor shall grant, sell, assign, transfer and deliver to the Buyer all right, title and interest of the Debtor in, to and under the 2014 Ford F150 VIN 1FTFW1EF7EFD05107, subject to the Buyer's assumption and payment of SunTrust's Allowed Class 2B Claim, but free and clear of any and all other Liens, Claims, and Encumbrances.  In such event, SunTrust's Allowed Class 2B Claim shall constitute an Assumed Liability pursuant to the Asset Purchase Agreement and the Buyer shall pay the Allowed Class 2B Claim pursuant to the agreement between the Buyer and SunTrust.

(2)    If the Buyer does not exercise the option set forth above, on the Effective Date or as soon as practicable thereafter, the Debtor shall surrender the 2014 Ford F150 VIN 1FTFW1EF7EFD05107 to SunTrust in full and final satisfaction of its Allowed Class 2B Claim.

Classes 2A and 2B are Impaired and are entitled to vote to accept or reject the Plan.

***Class 3: Allowed Secured Tax Claims.***  Class 3 is comprised of consists of all Allowed Secured Tax Claims of Governmental Units.  The Allowed Class 3 Secured Tax Claims are an Assumed Liability of the Buyer pursuant to Article 2.3 of the Asset Purchase Agreement, and shall be assumed by the Buyer on the Closing Date and paid in accordance with Section 1129(a)(9)(D) of the Bankruptcy Code, or under such other terms as may be agreed upon by both the Holder of such Allowed Secured Tax Claim and the Buyer.  Class 3 is Impaired and is entitled to vote to accept or reject the Plan.

***Class 4: Allowed Claim of Synovus.***  Class 4 consists of the Allowed Claim of Synovus.  Synovus's Allowed Claim is an Assumed Liability of the Buyer pursuant to

Article 2.3(b) of the Asset Purchase Agreement, and shall be assumed by the Buyer on the Closing Date and paid in accordance with the Synovus Bank Loan Documents (as defined in Article 1.1 of the Asset Purchase Agreement), provided that both of the life insurance policies assigned to Synovus as collateral by Marianne Barker and the personal guaranty of Kevin Barker remain in place following the Closing.  Class 4 is Unimpaired and, therefore, is not entitled to vote to accept or reject the Plan.  Class 4 is presumed to have accepted the Plan.

***Class 5: Allowed Claims of Existing Customers.***  Class 5 consists of all Claims of Existing Customers.  As set forth on Schedule 7.4 to the Asset Purchase Agreement, the treatment of Existing Customers is set forth below:

A.  All 40' Cat Existing Boat Contracts would be replaced with contracts that are priced to the current fair market value for such boats and shall be subject to the provisions of subsection C, below.

B.  All Existing Boat Contracts for the 26' Bay and the 26' Open would be replaced with new contracts and be subject to the provisions of subsection C, below.

C.  In respect of each of the 26' Bay, 26' Open and 40' Cat, customers that have boats on order as of the Closing and who elect to enter into a New Boat Contract with the Buyer will be required to elect one of the following scenarios:

a.  Scenario 1: The customer would be permitted to utilize 100% of the customer's deposit and 100% of any progress payments made on the customer's current boat on order as of the Closing as follows: 50% of the deposit and 50% of any progress payments will be applied to the customer's boat on order as of the Closing. The customer would then have the option to (i) immediately order any 35+' boat and apply the remaining 50% balance of the customer's deposit and progress payments to such new order, or (ii) order any other Barker or Canyon Bay model (excluding the Barker 26), up to 35' long, twelve (12) months after delivery of the boat on order as of the Closing and apply the remaining 50% balance of the customer's deposit and progress payments to such new order, or (iii) order a Barker 26 boat twenty-four (24) months after delivery of the boat on order as of the Closing and apply the remaining 50% balance of the customer's deposit and progress payments towards such new order. If either option is exercised by the customer, the second boat would be sold at the fair market value at the time of such exercise.

b.  Scenario 2: The customer would be permitted to utilize 60% of the customer's deposit and 60% of any progress payments made on

the customer's current boat on order as of the Closing, which amounts will be applied to the completion of such boat.

c.  Scenario 3: The customer can choose to not complete its boat order and 100% of the customer's deposit and 100% of any progress payments made on the customer's current boat on order as of the Closing will be general unsecured claims in the Bankruptcy Case.

d.  Each Existing Customer shall have until the Voting Deadline to elect Scenario 1, 2, or 3; provided, however, that the Buyer may, in its sole and absolute discretion, extend the time for an Existing Customer to elect Scenario 1 or 2 and enter into a New Boat Contract.  Any Existing Customer that fails to timely elect Scenario 1 or 2 shall be deemed to have elected Scenario 3.

e.  Any Existing Customer electing Scenario 1 or 2 shall be an Accepting Customer and shall be deemed to have waived all Claims, including, without limitation, Priority Claims pursuant to Section 507(a)(7) of the Bankruptcy Code and Unsecured Claims, including rejection damage claims, as a result of the Debtor's rejection of such customer's Existing Boat Contract, against the Debtor, the bankruptcy estate, and the Liquidating Trust, and shall not receive any distributions under the Plan.

f.  Any Accepting Customer shall not be entitled to vote to accept or reject the Plan.

g.  Any Non-Accepting Customer is deemed to have elected Scenario 3, shall have an Allowed Class 1 Priority Claim in the amount of $3,025.00, with the balance of the claim treated in accordance with Class 6.

h.  Any Non-Accepting Customer shall be entitled to vote to accept or reject the Plan in accordance with Class 6.

**Class 6: Allowed Unsecured Claims (Not Otherwise Classified).**  Class 6 consists of all Allowed Unsecured Claims against the Debtor not otherwise specifically classified in the Plan.  Each Holder of an Allowed Class 6 General Unsecured Claim shall receive such Holder's Pro Rata Share of the Unsecured Creditor Carve-Out, to be paid within thirty (30) days of the Effective Date.  Class 6 is Impaired and entitled to vote to accept or reject the Plan.

**Class 7: Equity Interests.**  Class 7 consists of all Equity Interests.  On the Effective Date, the Equity Interests shall be cancelled and extinguished. Class 7 is deemed to have rejected the Plan and is therefore not entitled to vote to accept or reject the Plan.

17

## ACCEPTANCE OR REJECTION OF THE PLAN

**Each Impaired Class Entitled to Vote Separately.**  The Holders of Claims in each Impaired Class of Claims will be entitled to vote separately to accept or reject the Plan.

**Acceptance by Impaired Classes.**  Classes 2A, 2B, 3 and 6 are Impaired[2] under the Plan, and the Holders of Claims in such Classes are entitled to vote to accept or reject the Plan.  Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims will have accepted the Plan if (a) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  Pursuant to Section 1126(d) of the Bankruptcy Code, an Impaired Class of Equity Interests will have accepted the Plan if the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in amount of the Allowed Equity Interests actually voting in such Class have voted to accept the Plan.

**Presumed Acceptance of Plan by Unimpaired Classes.**  Classes 1 and 4 are Unimpaired.  Pursuant to Section 1126(f) of the Bankruptcy Code, each such Class and the Holders of Claims and Equity Interests in such Classes are conclusively presumed to have accepted the Plan and, thus, are not entitled to vote on the Plan. Except as otherwise expressly provided in the Plan, nothing contained in the Plan or otherwise will affect the Debtor's or the Liquidating Trustee's rights and legal and equitable claims or defenses in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

**Impairment Controversies.**  If a controversy arises as to whether any Claim or Equity Interest, or any Class of Claims or Class of Equity Interests, is Impaired under the Plan, such Claim, Equity Interest or Class shall be treated as specified in the Plan unless the Bankruptcy Court shall determine such controversy upon motion of the party challenging the characterization of a particular Claim or Equity Interest, or a particular Class of Claims or Class of Equity Interests, under the Plan.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**Assumption or Rejection of Executory Contracts and Unexpired Leases.**  The treatment of executory contracts and unexpired leases identified by the Buyer as assumed contracts in the Asset Purchase Agreement, which are listed in **Exhibit A** attached hereto (collectively, the "**Assumed Contracts**"), shall be governed by the terms contained in the Sale Order and the Assumed Contracts Order.  Any executory contract or unexpired lease

---

2 The Existing Customers in Class 5 either timely elect Scenario 1 or 2, pursuant to which they waive any Claims, distributions, and the right to vote, or they elect or are deemed to have elected Scenario 3, pursuant to which they vote in accordance with Class 6.  Accordingly, Class 5 is a non-voting Class.

that exists between the Debtor and another Person or Entity that is not listed on **Exhibit A** attached hereto (including the Existing Boat Contracts) shall be deemed rejected by the Debtor as of the Confirmation Date (collectively, the "**Rejected Contracts**"), unless there is pending before the Bankruptcy Court on the Confirmation Date a motion to assume such executory contract or unexpired lease.

*Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.* Entry of the Confirmation Order, the Sale Order, or the Assumed Contracts Order, as the case may be, shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Article 7.01 of this Plan, (ii) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Article 7.01 of this Plan, and (iii) the extension of time, pursuant to Section 365(d)(4) of the Bankruptcy Code, within which the Debtor may assume, assume and assign, or reject any unexpired lease of nonresidential real property through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired lease. The assumption and assignment by the Debtor of an Assumed Contract shall be binding upon any and all parties to such Assumed Contract as a matter of law, and each such Assumed Contract shall be fully enforceable by the Buyer in accordance with its terms, except as modified by the provisions of the Plan or an order of the Bankruptcy Court.

*Inclusiveness.* Unless otherwise specified on **Exhibit A** to the Plan, each executory contract and unexpired lease listed on **Exhibit A** shall include all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on **Exhibit A**.

*Cure of Defaults.* Any lessor, lessee, or other party to an Assumed Contract (except those lessors, lessees, or other parties whose unexpired leases or executory contracts have been previously assumed by a Final Order of the Bankruptcy Court) asserting a Cure Claim in connection with the assumption of any unexpired lease or executory contract under Article 7.01, as contemplated by Section 365(b) of the Bankruptcy Code, shall file such Cure Claim with the Bankruptcy Court on or before the Cure Claim Deadline established by the Bid Procedures Order, asserting all alleged amounts accrued or alleged defaults. Any lessor or other party to an Assumed Contract that fails to file a Cure Claim by the Cure Claim Deadline shall be forever barred from asserting, collecting or seeking to collect any amounts or defaults relating thereto against the Debtor, the Liquidating Trust, or the Buyer. Any timely filed Cure Claims shall be the responsibility of the Buyer, and neither the Debtor nor the Liquidating Trust shall have any liability to any Person or Entity on account of any Cure Claims.

**Claims Under Rejected Contracts and Unexpired Leases.**

Unless otherwise ordered by the Bankruptcy Court, any Claim for damages arising by reason of the rejection of any executory contract or unexpired lease must be filed with

the Bankruptcy Court on or before the Bar Date for rejection damage Claims in respect of such rejected executory contract or unexpired lease or such Claim shall be forever barred and unenforceable against the Debtor or the Liquidating Trust.  As set forth herein, Accepting Customers are deemed to have waived all Claims, including rejection damage claims as a result of the Debtor's rejection of such customer's Existing Boat Contract, against the Debtor, the bankruptcy estate, and the Liquidating Trust.  With respect to the Rejected Contracts, the Bar Date for filing rejection damage and other Claims with the Bankruptcy Court shall be thirty (30) days after the Confirmation Date.  The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the Bar Date for filing a Claim in connection therewith.

All Claims for damages from the rejection of an executory contract or unexpired lease, once fixed and liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall be Allowed Unsecured Claims in Class 6.

## MEANS OF IMPLEMENTATION OF THE PLAN

*General Overview of the Plan.* The Plan provides for the distribution of the Cash Sale Proceeds and any other recoveries realized by the Debtor or the Liquidating Trustee on account of the Excluded Assets.  The Plan provides for Cash payments to Holders of Allowed Claims, except Holders of Equity Interests, all as more particularly described in Articles 3 and 5 of the Plan. The Plan shall be implemented on the Effective Date.

*Sale of Debtor's Assets Pursuant to the Asset Purchase Agreement.* The Debtor determined that it would be in the best interests of its creditors and the estate to maximize value through a sale of substantially all of its assets pursuant to Section 363 of the Bankruptcy Code.  Absent such a sale, the Debtor will most likely be facing a liquidation under Chapter 7 of the Bankruptcy Code, which would achieve far less for creditors than a sale as a going concern.

Prior to the filing of the Bankruptcy Case, the Debtor received an offer from the Buyer to purchase substantially all of the assets of the Debtor in a sale transaction under Section 363 of the Bankruptcy Code.  This offer was memorialized in the Letter of Intent (as defined in the Asset Purchase Agreement).

On April 29, 2019, the Debtor and SFS entered into an Asset Purchase Agreement, pursuant to which the Debtor agreed to sell to the Buyer, and the Buyer agreed to purchase from the Debtor, the Purchased assets pursuant to Sections 363 and 365 of the Bankruptcy Code free and clear of any and all Liens, Claims, and Encumbrances, excepting certain Assumed Liabilities and the Permitted Liens.

As set forth in the Asset Purchase Agreement, the consideration to be paid by the Buyer to the Debtor for the Purchased Assets shall be the sum of the following: (i) the cost to build the first five (5) boats on order (estimated to be One Million and 00/100 Dollars ($1,000,000.00)), (ii) the cost to build the next twenty-seven (27) boats on order (estimated

to be Three Million Five Hundred Thirty Thousand and 00/100 Dollars ($3,530,000.00)), (iii) the 40' Cat boats tooling completion (estimated to be One Million and 00/100 Dollars ($1,000,000.00)), (iv) the 40' Cat boats production cost for eight (8) boats (estimated to be Two Million Seven Hundred Twenty Thousand and 00/100 Dollars ($2,720,000.00)), (v) the amount of the Assumed Liabilities (excluding, however, any Assumed Liabilities described in Section 2.3(c) of the Asset Purchase Agreement that are already included in subparagraphs (i)-(iv) above), (vi) the aggregate amount of any advances under the DIP Loan plus any other DIP Loan Obligations (excluding, however, any such advances that are already included in subparagraphs (i)-(iv) above), and (vii) an amount not to exceed Fifty Thousand and 00/100 Dollars ($50,000.00) representing the General Unsecured Creditor Carve-Out (collectively, the "**Purchase Price**"); provided, however, that the Purchase Price shall be subject to downward adjustment to the extent that any amounts included in subparagraphs (i)-(iv) above relate to Existing Boat Contracts that are not converted into New Boat Contracts as provided in the Asset Purchase Agreement. The actual amount of the Purchase Price shall be included in the Sale Order. The Purchase Price shall be paid by the Buyer's performance of the New Boat Contracts as contemplated by Section 7.4 of the Asset Purchase Agreement, the Buyer's assumption and performance of the Assumed Liabilities, and the Buyer providing the DIP Loan, in each case as described in the Asset Purchase Agreement, and no portion of the Purchase Price shall be paid in cash (except for any advances to the Debtor under the DIP Loan, the amounts payable in cash described in Section 2.3 of the Asset Purchase Agreement, and the General Unsecured Creditor Carve-Out).

The Asset Purchase Agreement provides that the Buyer shall assume the future payment and performance of certain liabilities, as specifically described in Section 2.3 of the Asset Purchase Agreement. All liabilities under, arising from, or relating to the Assumed Contracts listed on **Exhibit A** to the Assumed Contracts Motion with respect to (i) matters occurring thereunder on or after the Closing Date, and (ii) the Cure Claims constitute Assumed Liabilities pursuant to Article 2.3(a) of the Asset Purchase Agreement. All liabilities that are not Assumed Liabilities are excluded liabilities under the Asset Purchase Agreement.

Pursuant to the Bid Procedures Order, the Bankruptcy Court has established bidding procedures in connection with the sale by the Debtor of substantially all of its assets. The deadline by which any competing bids are to be submitted to the Debtor, its counsel, and the Office of the United States Trustee is **5:00 p.m. (Eastern Daylight Time) on June 7, 2019** (or such later date agreed to by the Debtor). If competing bids are received by the Bid Deadline, an Auction to determine the best and highest offer for the Purchased Assets will be held at **10:00 a.m. (Eastern Daylight Time) on June 11, 2019**, at the offices of Stichter, Riedel, Blain & Postler, P.A., 110 East Madison Street, Suite 200, Tampa, Florida 33602.

As provided for in the Bid Procedures Order, SFS was selected by the Debtor and approved by the Bankruptcy Court as the "stalking horse bidder" under the Bid Procedures. Accordingly, SFS shall be entitled to the Break-Up Fee under the circumstances provided for in the Bid Procedures Order and the Asset Purchase Agreement.

On April 29, 2019, the Debtor filed the Sale Motion and the Assumed Contracts Motion. In the Sale Motion, the Debtor has requested that the Bankruptcy Court enter the Sale Order and approve (i) the execution and delivery by the Debtor of the Asset Purchase Agreement, and (ii) the sale and purchase of the Purchased Assets and the other transactions contemplated by the Asset Purchase Agreement. In the Assumed Contracts Motion, the Debtor has requested that the Bankruptcy Court enter an Assumed Contracts Order and approve the assumption and/or assignment of certain executory contracts and/or unexpired non-residential real property leases to SFS, subject to the terms and conditions of the Asset Purchase Agreement, free and clear of any and all Liens, Claims, and Encumbrances. The Closing under the Asset Purchase Agreement is contemplated to occur in conjunction with the Effective Date of the Plan. A hearing on the Sale Motion shall be held before the Honorable Michael G. Williamson, Sam M. Gibbons United States Courthouse, 801 North Florida Avenue, Courtroom 8A, Tampa, Florida 33602 on **June 12, 2019 at 10:30 a.m.** (the "**Sale Hearing**").

The above is a brief summary of the material terms of the Asset Purchase Agreement, the Bid Procedures Order, the Sale Motion, and the Assumed Contracts Motion. Holders of Claims and Equity Interests are encouraged to read the Asset Purchase Agreement, and other relevant documents, in their entirety for a more detailed description. Each of these documents are on file with the Clerk of the Bankruptcy Court, or are available upon request to Bankruptcy Counsel.

***Effective Date Actions.*** Subject to the approval of the Bankruptcy Court and the satisfaction or waiver of the conditions precedent to the occurrence of the Effective Date contained in Article 11 of the Plan, on or as of the Effective Date, the Plan shall be implemented and the following actions shall thereafter immediately occur:

(c)     the Closing of the purchase and sale of the Purchased Assets shall occur;

(d)     the appointment of the Liquidating Trustee shall become effective;

(e)     the Liquidating Trust Agreement shall be executed by all parties thereto and, except as otherwise set forth in the Plan, the Liquidating Trust Assets shall be deemed transferred and delivered to the Liquidating Trust;

(f)     all Claims shall be deemed automatically channeled, transferred, and attached solely and exclusivity to the Liquidating Trust; and

(g)     the Debtor and the Liquidating Trustee shall carry out their respective responsibilities under the Plan, including the execution and delivery of all documentation contemplated by the Asset Purchase Agreement, the Plan, and the Plan Documents.

***Transfer of the Debtor's Purchased Assets.*** At the Closing, the Debtor's Purchased Assets shall be transferred to the Buyer free and clear of any and all Liens, Debts, obligations, Claims, Cure Claims, Liabilities, encumbrances, and all other interests of every kind and nature, except for Assumed Liabilities and the Permitted Liens. To the extent that

the foregoing protections differ in any respect from the similar protections contained in the Sale Order, the Sale Order shall control.

***Vesting of Property of the Estate in the Liquidating Trust.***   On the Effective Date, except as otherwise expressly provided in the Plan and the Sale Order, all Excluded Assets shall vest in, and become assets of, the Liquidating Trust, free and clear of any and all Liens, Debts, obligations, Claims, Cure Claims, Liabilities, Equity Interests, and all other interests of every kind and nature, and the Confirmation Order shall so provide. The Liquidating Trustee intends to preserve net operating losses to the maximum extent permitted under applicable law. As of the Effective Date, the Liquidating Trustee may use, acquire, and dispose of its property, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

***Continued Limited Corporate Existence; Dissolution.***   The Debtor will continue to exist after the Effective Date for a limited period of time to wind-down the Debtor's affairs. Thereafter, the Debtor will be formally dissolved in accordance with its organizational documents.

***Corporate Action.***   All matters provided for under the Plan involving the corporate structure of the Debtor, or any corporate action to be taken by or required of the Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the Equity Holders, board of directors, or board of managers of the Debtor.

***Section 1146 Exemption.***   Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any security, or the making, delivery or recording of any instrument of transfer, pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or the vesting, re-vesting, transfer or sale of any Property of, by or in the Debtor, the Estate, or the Liquidating Trust pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or any transaction arising out of, contemplated by or in any way related to the foregoing, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangible or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall be, and hereby are, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

***Pursuit of Causes of Action.***

On the Effective Date, the Causes of Action shall be vested in the Liquidating Trust, except to the extent a Creditor or other third party has been specifically released from any Cause of Action by the terms of the Plan or by a Final Order of the Bankruptcy Court; provided, however, that Kevin Barker shall continue to direct the prosecution of the Yellowfin Lawsuit, and fifty percent (50%) of any recovery from the Yellowfin Lawsuit

shall inure to Kevin Barker and the remaining fifty percent (50%) shall inure to the Buyer, as it constitutes a Purchased Asset. The Yellowfin Lawsuit shall not be property of the Liquidating Trust. The Liquidating Trustee will have the right, in his sole and absolute discretion, to pursue, not pursue, settle, release or enforce any Causes of Action without seeking any approval from the Bankruptcy Court except as provided in this Article 8. The Debtor is currently not in a position to express an opinion on the merits of any of the Causes of Action or on the recoverability of any amounts as a result of any such Causes of Action. For purposes of providing notice, the Debtor states that any party in interest that engaged in business or other transactions with the Debtor Prepetition or that received payments from the Debtor Prepetition may be subject to litigation to the extent that applicable bankruptcy or non-bankruptcy law supports such litigation.

No Creditor or other party should vote for the Plan or otherwise rely on the Confirmation of the Plan or the entry of the Confirmation Order in order to obtain, or on the belief that it will obtain, any defense to any Cause of Action. No Creditor or other party should act or refrain from acting on the belief that it will obtain any defense to any Cause of Action. ADDITIONALLY, EXCEPT AS SET FORTH IN THE PLAN, THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY CAUSES OF ACTION OR OBJECTIONS TO CLAIMS INCLUDING, WITHOUT LIMITATION, ANY CAUSES OF ACTION DESCRIBED IN THE SCHEDULES, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF THE LIQUIDATING TRUSTEE. Creditors are advised that legal rights, claims and rights of action the Debtor may have against them, if they exist, are retained under the Plan for prosecution unless the Plan provides otherwise. As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim or right of action against a particular Creditor in the Disclosure Statement, the Plan, or the Schedules, or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the Debtor or the Liquidating Trustee does not possess or does not intend to prosecute a particular claim or Cause of Action if a particular Creditor votes to accept the Plan. It is the expressed intention of the Plan to preserve rights, objections to Claims, and rights of action of the Debtor, whether now known or unknown, for the benefit of the Liquidating Trust. A Cause of Action shall not, under any circumstances, be waived as a result of the failure of the Debtor to describe such Cause of Action with specificity in the Plan or in the Disclosure Statement; nor shall the Liquidating Trustee, as a result of such failure, be estopped or precluded under any theory from pursuing such Cause of Action. Nothing in the Plan operates as a release of any of the Causes of Action, except as expressly provided otherwise.

The Debtor does not presently know the full extent of the Causes of Action and, for purposes of voting on the Plan, all Creditors are advised that the Liquidating Trustee will have substantially the same rights that a Chapter 7 trustee would have with respect to the Causes of Action. Accordingly, neither a vote to accept the Plan by any Creditor nor the entry of the Confirmation Order will act as a release, waiver, bar or estoppel of any Cause of Action against such Creditor or any other Person or Entity, unless such Creditor, Person or Entity is specifically identified by name as a released party in the Plan, in the Confirmation Order, or in any other Final Order of the Bankruptcy Court. Confirmation of the Plan and entry of the Confirmation Order is not intended to and shall not be deemed to have any *res judicata* or collateral estoppel or other preclusive effect that would precede,

preclude, or inhibit prosecution of such Causes of Action following Confirmation of the Plan.

The Liquidating Trust shall remain open, even if the Bankruptcy Case shall have been closed, as to any and all Causes of Action until such time as the Causes of Action have been fully administered and the assets of the Liquidating Trust have been distributed as provided in this Plan.

The Debtor and the Liquidating Trustee reserve all rights under Section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims.

***Prosecution and Settlement of Causes of Action.*** The Liquidating Trustee (a) may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of any Cause of Action which the Debtor had or had power to assert immediately prior to the Effective Date, and (b) may settle or adjust such Cause of Action. From and after the Effective Date, the Liquidating Trustee shall be authorized, pursuant to Bankruptcy Rule 9019 and Section 105(a) of the Bankruptcy Code, to compromise and settle any Cause of Action or objection to a Claim in accordance with the following procedures, which shall constitute sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromises and settlements: (i) if the resulting settlement provides for settlement of a Cause of Action or objection to a Claim originally asserted in an amount equal to or less than $25,000.00, then the Liquidating Trustee may settle the Cause of Action or objection to Claim and execute necessary documents, including a stipulation of settlement or release, subject to notifying the United States Trustee; provided, however, that if the United States Trustee indicates its approval or does not provide the Liquidating Trustee with an objection to the proposed settlement within ten (10) days after it receives notice of such settlement in writing, then the Liquidating Trustee shall be authorized to accept and consummate the settlement; and provided further, however, that if a timely written objection is made by the United States Trustee to the proposed settlement, then the settlement may not be consummated without approval of the Bankruptcy Court in accordance with Bankruptcy Rule 9019; and (ii) if the resulting settlement involves a Cause of Action or objection to a Claim originally asserted in an amount exceeding $25,000.00, then the Liquidating Trustee shall be authorized and empowered to settle such Cause of Action or objection to Claim only upon Bankruptcy Court approval in accordance with Bankruptcy Rule 9019 and after notice to the Notice Parties. Notwithstanding anything herein to the contrary, nothing herein shall obligate or require the Liquidating Trustee to pursue any Causes of Action.

***Effectuating Documents; Further Transactions.*** Prior to the Effective Date, the manager of the Debtor (and, on and after the Effective Date, the Liquidating Trustee) shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, mortgages, and other agreements or documents and take such actions as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan or to otherwise comply with applicable law.

**PROVISIONS GOVERNING DISTRIBUTIONS**

*Distributions.* As soon as reasonably practicable (as determined by the Liquidating Trustee) on or after the Effective Date, the Liquidating Trustee shall make the Distributions required under the Plan to Holders of Allowed Claims as and when required by the terms of the Plan.

### *Determination of Claims.*

From and after the Effective Date, the Liquidating Trustee shall have the exclusive authority to, in its sole discretion, to file, settle, compromise, withdraw, or litigate to judgment all objections to Claims. Except as to any late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases, if any, all objections to Claims shall be filed with the Bankruptcy Court by no later than sixty (60) days following the Effective Date (unless such period is extended by the Bankruptcy Court upon motion of the Liquidating Trustee), and the Confirmation Order shall contain appropriate language to that effect. Holders of Unsecured Claims that have not filed such Claims on or before the Bar Date shall serve the Notice Parties with any request to the Bankruptcy Court for allowance to file late Unsecured Claims. If the Bankruptcy Court grants the request to file a late Unsecured Claim, such Unsecured Claim shall be treated in all respects as a Class 6 Unsecured Claim. Objections to late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases shall be filed on the later of (a) sixty (60) days following the Effective Date or (b) the date sixty (60) days after the Liquidating Trustee receives actual notice of the filing of such Claim.

Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtor or the Liquidating Trustee, as the case may be, effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for the Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto, or (c) by first class mail, postage prepaid, on any counsel that has filed a notice of appearance in the Bankruptcy Case on behalf of the Holder of a Claim.

Disputed Claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B) unless the Bankruptcy Court orders otherwise. If the fixing or liquidation of a contingent or unliquidated Claim would cause undue delay in the administration of the Bankruptcy Case, such Claim shall be estimated by the Bankruptcy Court for purposes of allowance and Distribution. The Debtor or the Liquidating Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtor or the Liquidating Trustee previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any

such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtor or the Liquidating Trustee may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim.  The determination of Claims in Estimation Hearings shall be binding for purposes of establishing the maximum amount of the Claim for purposes of allowance and Distribution.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Procedures for specific Estimation Hearings, including provisions for discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the Disputed Claim.

### *Distributions as to Allowed Claims in Class 6.*

Each Holder of an Allowed Unsecured Claim in Class 6 shall receive a Cash Distribution, on the applicable Distribution Date, in the amount provided for in Article 5 of the Plan.

Notwithstanding any provision herein to the contrary, no Distribution shall be made to the Holder of a Disputed Claim in Class 6 unless and until such Disputed Claim becomes an Allowed Claim.  At such time that such Disputed Claim becomes an Allowed Class 6 Claim, the Holder of such Allowed Class 6 Claim shall receive the Distribution to which such Holder is then entitled under the Plan.

Notwithstanding any provision herein to the contrary, if, on any applicable Distribution Date, the Holder of a Class 6 Claim is subject to a proceeding against it by the Liquidating Trustee under Section 502(d) of the Bankruptcy Code, then the Liquidating Trustee (in his sole discretion) may withhold a Distribution to such Holder until the final resolution of such proceeding.

Distributions to a Holder of an Allowed Claim in Class 6 shall be made at the address of such Holder set forth in the Schedules or on the books and records of the Debtor or the Liquidating Trustee at the time of the Distribution, unless the Liquidating Trustee has been notified in writing of a change of address, including by the filing of a Proof of Claim or statement pursuant to Bankruptcy Rule 3003 by such Holder that contains an address for such Holder different than the address for such Holder as set forth in the Schedules.  The Liquidating Trustee shall not be liable for any Distribution sent to the address of record of a Holder in the absence of the written change thereof as provided herein.

### *Unclaimed Distributions.*

If the Holder of an Allowed Claim fails to negotiate a check for a Distribution issued to such Holder within sixty (60) days of the date such check was issued, then the Liquidating Trustee shall provide written notice to such Holder stating that, unless such Holder negotiates such check within thirty (30) days of the date of such notice, the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to

have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

If a check for a Distribution made pursuant to the Plan to any Holder of an Allowed Claim is returned to the Liquidating Trustee due to an incorrect or incomplete address for the Holder of such Allowed Claim, and no claim is made in writing to the Liquidating Trustee as to such check within sixty (60) days of the date such Distribution was made, then the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

Any unclaimed Distribution as described above sent by the Liquidating Trustee shall become the property of the Liquidating Trust.

***Transfer of Claim.***  In the event that the Holder of any Claim shall transfer such Claim on and after the Effective Date, such Holder shall immediately advise the Liquidating Trustee in writing of such transfer and provide sufficient written evidence of such transfer. The Liquidating Trustee shall be entitled to assume that no transfer of any Claim has been made by any Holder unless and until the Liquidating Trustee shall have received written notice to the contrary.  Each transferee of any Claim shall take such Claim subject to the provisions of the Plan and to any request made, waiver or consent given or other action taken hereunder and, except as otherwise expressly provided in such notice, the Liquidating Trustee shall be entitled to assume conclusively that the transferee named in such notice shall thereafter be vested with all rights and powers of the transferor under the Plan.

***One Distribution per Holder.***  If the Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of Distribution hereunder, and only one Distribution shall be made with respect to the single aggregated Claim.

***Effect of Pre-Confirmation Distributions.***  Nothing in the Plan shall be deemed to entitle the Holder of a Claim that received, prior to the Effective Date, full or partial payment of such Holder's Claim, by way of settlement or otherwise, pursuant to an order of the Bankruptcy Court, provision of the Bankruptcy Code, or other means, to receive a duplicate payment in full or in part pursuant to the Plan; and all such full or partial payments shall be deemed to be payments made under the Plan for purposes of satisfying the obligations of the Debtor or the Liquidating Trust to such Holder under the Plan.

***No Interest on Claims.***  Except as expressly stated in the Plan or otherwise Allowed by a Final Order of the Bankruptcy Court, no Holder of an Allowed Claim shall be entitled to the accrual of Postpetition interest or the payment of Postpetition interest, penalties, or late charges on account of such Allowed Claim for any purpose.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a Disputed Claim becomes an Allowed Claim.

*Compliance with Tax Requirements.*  In connection with the Plan, the Liquidating Trust shall comply with all tax withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities, and all Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution.

*De Minimis Distributions on Account of Class 6 Unsecured Claims.* To avoid the disproportionate expense and inconvenience associated with making *de minimus* distributions, the Liquidating Trustee will not be required to make, and will be excused from making, distributions in amounts of less than twenty-five dollars ($25.00) each to Holders of Allowed Class 6 Claims.

### LIQUIDATING TRUST

*Appointment of Liquidating Trustee*.  Appointment of the Liquidating Trustee shall be subject to approval of the Bankruptcy Court.  The Liquidating Trustee shall be independent of the Debtor and creditors.  The Liquidating Trustee shall file an affidavit demonstrating that such Person is disinterested as defined in Section 101(14) of the Bankruptcy Code; provided, however, if such Person is a Professional, any Allowed Administrative Expense Claim shall not render such Person non-disinterested.  If approved by the Bankruptcy Court, the Person so designated shall become the Liquidating Trustee on the Effective Date.  The Liquidating Trustee shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Liquidating Trust Agreement and in the Plan.

*Establishment of Liquidating Trust*.  On the Effective Date, the Liquidating Trust and the Liquidating Trust Agreement shall be deemed effective without any further action by any party. The Liquidating Trust Agreement shall establish the Liquidating Trust which shall be a distinct legal entity from the Debtor, which shall have no liability whatsoever for any obligations of the Liquidating Trust pursuant to the Plan, the Liquidating Trust Agreement or otherwise, and is intended to qualify as a Qualified Settlement Fund pursuant to Internal Revenue Code Section 468B.  On the Effective Date, except as otherwise expressly provided in the Plan and the Sale Order, all Excluded Assets shall vest in, and become assets of, the Liquidating Trust, free and clear of any and all Liens, Debts, obligations, Claims, Cure Claims, Liabilities, Equity Interests, and all other interests of every kind and nature, and the Confirmation Order shall so provide.

*Irrevocable Trust*.  Any and all funds or assets in the Liquidating Trust shall be held in an irrevocable trust for distribution to Holders of Allowed Claims. Such distributions shall be made in accordance with the procedures set forth in the Plan and the terms of the Liquidating Trust Agreement, and the Confirmation Order shall contain appropriate language to that effect. Once funds or assets are deposited into the Liquidating Trust, they shall no longer be Property of the Debtor or any other Person or Entity and none of the foregoing shall have any claim to said funds or assets.

***Channeling Injunction***.  On the Effective Date, all Claims shall be automatically deemed channeled, transferred and attached solely and exclusively to the Liquidating Trust, and the sole and exclusive right and remedy available to Creditors shall be the entitlement, in accordance with the Plan and the Liquidating Trust Agreement, to assert Claims solely and exclusively against the Liquidating Trust. The transfer to, vesting in and assumption by the Liquidating Trust of the Liquidating Trust Assets, as contemplated in the Plan and the Liquidating Trust Agreement, shall, as of the Effective Date, discharge, release and extinguish all obligations and Liabilities of the Debtor for and in respect of all Claims. The Liquidating Trust shall assume sole responsibility and liability for all Claims and such Claims shall be paid from the Liquidating Trust Assets as described in this Article 10. Notwithstanding anything to the contrary contained in the Plan or in the Disclosure Statement, the Debtor shall have no liability with respect to any Claims or with respect to any operations of the Debtor prior to the Effective Date.  The Confirmation Order shall contain appropriate language incorporating the foregoing and permanently enjoining any Holder of any Claim from taking any action in violation of this Article 10.  The entry of the Confirmation Order will act as a full and complete discharge of all Claims, Debts, Liabilities, and/or interests arising from, relating to or in connection with Claims, except to the extent that the Liquidating Trust Agreement or the Plan provides a mechanism for the payment or resolution thereof.

***Cash Distributions from the Liquidating Trust***.  Pursuant to and subject to the Liquidating Trust Agreement, each Holder of an Allowed Claim shall receive, in exchange for such Holder's Allowed Claim, units of beneficial interest in the Liquidating Trust which will thereafter represent the distribution such Holder is entitled to receive under the Plan. Upon issuance, the units of beneficial interest shall not be certificated and are not transferable (except as otherwise provided in the Liquidating Trust Agreement). Under Section 1145 of the Bankruptcy Code, the issuance of units of beneficial interest under the Plan shall be exempt from registration under the Securities Act and applicable state and local laws requiring registration of securities. If the Liquidating Trustee determines, with the advice of counsel, that the Liquidating Trust is required to comply with the registration and reporting requirements of the Exchange Act or the Investment Company Act of 1940, as amended, then the Liquidating Trustee shall take any and all actions to comply with such reporting requirements and file necessary periodic reports with the SEC.

Each Holder of an Allowed Claim shall receive, on the Distribution Date, a Cash distribution out of the Liquidating Trust Assets as set forth in the Plan; provided, however, that if such Holder's Claim has been bifurcated into an Allowed Claim and a Disputed Claim because the amount of the Claim specified on such Holder's Proof of Claim exceeds the amount of the corresponding Claim scheduled in the Schedules, then such Holder's Disputed Claim shall be deemed an Allowed Claim for distribution purposes on such Distribution Date, unless the Liquidating Trustee files an objection to such Disputed Claim prior to the Distribution Date; and provided, further, however, if, on the Distribution Date, any Disputed Claims remain, then the Liquidating Trustee shall withhold from any such distribution the amount of funds that would be necessary to make the same proportionate distribution to the Holders of Claims which are Disputed Claims as if each such Disputed Claim were an Allowed Claim. At such time that the Disputed Claim becomes an Allowed

Claim, the Holder of such Allowed Claim shall receive the distribution to which such Holder is then entitled under the Plan.

***Duties of the Liquidating Trustee***.  The Liquidating Trustee shall have the following duties under the Liquidating Trust Agreement:

> (a)    resolve any pending objections to Claims, and file or otherwise assert any objections necessary or appropriate to resolve all Disputed Claims;

> (b)    make any required distribution from the Liquidating Trust to the Holders of Allowed Claims, in accordance with the terms and provisions of the Plan and the Liquidating Trust Agreement;

> (c)    pursue, investigate, prosecute, compromise and otherwise resolve the Causes of Action;

> (d)    administer the Liquidating Trust Assets;

> (e)    pursue any assets of the Debtor that should be transferred to the Liquidating Trust;

> (f)    provide annual financial information and other periodic reports to the Holders of Allowed Claims, in accordance with the terms and provisions of the Liquidating Trust Agreement; and

> (g)    perform such other duties as may be set forth in the Liquidating Trust Agreement or elsewhere in the Plan.

The Liquidating Trust Agreement shall also provide for the Liquidating Trustee to perform duties commonly performed by, and have the powers commonly provided to, such trustees, as more specifically set forth in the Liquidating Trust Agreement, including, among other things, obtaining tax identification number(s) for the Liquidating Trust, preparing and filing appropriate federal and state tax returns for the Liquidating Trust, opening a bank account for the Liquidating Trustee, maintaining records pertaining to the units of beneficial interest of the Holders of all Allowed Claims in the Liquidating Trust, and retaining professionals to represent the interests of the Liquidating Trust. For purposes of performing all of the foregoing, as well as for purposes of prosecuting to conclusion objections to Claims and Causes of Action only, the Liquidating Trustee shall have hereunder the status of a representative of the Estate under 11 U.S.C. § 1123(b)(3)(B). Until the Bankruptcy Case is closed, the Liquidating Trustee shall submit any proposed actions or compromises to the Bankruptcy Court as required by the terms of the Liquidating Trust Agreement, upon notice to the Notice Parties and such other parties as the Bankruptcy Court may direct (including any Holders of Allowed Claims who provide the Liquidating Trustee with written notice of their request to receive notice of such activities).  The United States Trustee shall not be required to supervise the Liquidating Trustee, but shall have standing to seek removal of the Liquidating Trustee.

***Expenses of the Liquidating Trust***.  All costs and expenses associated with the administration of the Liquidating Trust shall be the sole responsibility of and paid by the Buyer within a reasonable time following the Liquidating Trustee's presentation of an invoice to the Buyer. Under no circumstances shall any Liquidating Trust Expenses be an obligation of the Debtor or any other Person or Entity.

***Investment of Funds***.  The Liquidating Trustee shall invest the funds in the Liquidating Trust; provided, however, that the investment shall only be in United States government securities with a maturity date of ninety (90) days or less, money market funds or other similar short-term liquid investments. Any and all interest earned on the funds in the Liquidating Trust shall be added to the principal amount of the funds in the Liquidating Trust and shall be available, together with the principal amount, for distributions in accordance with the provisions of this Article 10.

***Federal Income Tax Treatment***.  For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under Section 301.7701-4 of the Procedure and Administration Regulations and that such trust is owned by its beneficiaries. Accordingly, for federal income tax purposes, it is intended that the beneficiaries (i.e., Holders of Allowed Claims) be treated as if they had received a distribution of an undivided interest in the Liquidating Trust Assets and then contributed such interests to the Liquidating Trust.

***Termination of Liquidating Trust.***  The Liquidating Trust shall terminate as provided in the Liquidating Trust Agreement.

## CONDITIONS PRECEDENT TO
## CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE

***Conditions Precedent to Confirmation of the Plan.***  The following is a condition precedent to Confirmation of the Plan: (a) the Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order in a manner consistent with the provisions of the Plan.

***Conditions Precedent to the Effective Date.***  The Plan shall not be consummated and the Effective Date shall not occur unless each of the following conditions has been satisfied following the Confirmation Date or waived by the Debtor:

    (a)     The Sale Order shall be a Final Order;

    (b)     The Assumed Contracts Order shall be a Final Order;

    (c)     The Confirmation Order (in form and substance satisfactory to the Debtor) shall be a Final Order; and

    (d)     The Closing shall have occurred.

*Waiver.*   The Debtor retains the right to waive any condition precedent to the Confirmation of the Plan or the Effective Date by filing a notice in the Bankruptcy Case. Any such waiver shall be effective immediately.

*Notice of the Effective Date.*   Promptly following the satisfaction, or the waiver by the Debtor, of all of the conditions set forth in Article 11.02, the Debtor shall file a notice (the "**Effective Date Notice**") with the Bankruptcy Court designating the Effective Date. The Debtor shall serve the Effective Date Notice on all of the Notice Parties.

### EXCULPATION FROM LIABILITY, GENERAL INJUNCTION, AND RELEASES

*Discharge of the Debtor.*   Pursuant to Section 1141(d)(3) of the Bankruptcy Code, the Debtor shall not receive a discharge.

*Exculpation from Liability.*   **The Debtor and its respective Postpetition officers, including Kevin Barker, and the Professionals for the Debtor (collectively, the "Exculpated Parties") shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan Document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Bankruptcy Case, in each case for the period on and after the Petition Date and through the Effective Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party.   With respect to Professionals, the foregoing exculpation from liability provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Bankruptcy Case. Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy.   The rights granted under this Article 12.02 are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law.   In furtherance of the foregoing, the Exculpated Parties shall have the fullest protection afforded under Section 1125(e) of the Bankruptcy Code and all applicable law from liability for violation of any applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan.   This exculpation from liability provision is an integral part of the Plan and is essential to its implementation.   Notwithstanding anything to the contrary contained herein, the provisions of this Article 12.02 shall not release, or be deemed a release of, any of the Causes of Action.**

*General Injunction.*   Pursuant to Sections 105, 1123, 1129 and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or Entities that have held, currently hold or may hold a Claim, Debt, or Liability that is discharged or terminated

pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged or terminated Claims, Debts, or Liabilities, other than actions brought to enforce any rights or obligations under the Plan or the Plan Documents:  (a) commencing or continuing in any manner any action or other proceeding against the Debtor or the Liquidating Trust or their respective properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor or the Liquidating Trust or their respective properties; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtor or the Liquidating Trust or their respective properties; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor or the Liquidating Trust; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Debtor or the Liquidating Trustee under the Plan and the Plan Documents and the other documents executed in connection therewith.  The Debtor and the Liquidating Trustee shall have the right to independently seek enforcement of this general injunction provision.  This general injunction provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of this Article 12.03 shall not release, or be deemed a release of, any of the Causes of Action.

***Term of Certain Injunctions and Automatic Stay.***

All injunctions or automatic stays for the benefit of the Debtor pursuant to Sections 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise provided for in the Bankruptcy Case, and in existence on the Confirmation Date, shall remain in full force and effect following the Confirmation Date and until the Final Decree Date, unless otherwise ordered by the Bankruptcy Court.

With respect to all lawsuits pending in courts in any jurisdiction (other than the Bankruptcy Court) that seek to establish the Debtor's liability on Prepetition Claims asserted therein and that are stayed pursuant to Section 362 of the Bankruptcy Code, such lawsuits shall be deemed dismissed as of the Effective Date, unless the Debtor affirmatively elects to have the Debtor's liability established by such other courts, and any pending motions seeking relief from the automatic stay for purposes of continuing any such lawsuits in such other courts shall be deemed denied as of the Effective Date, and the automatic stay shall continue in effect, unless the Debtor affirmatively elect to have the automatic stay lifted and to have the Debtor's liability established by such other courts; and the Prepetition Claims at issue in such lawsuits shall be determined and either Allowed or disallowed in whole or part by the Bankruptcy Court pursuant to the applicable provisions of the Plan, unless otherwise elected by the Debtor as provided herein.

***No Liability for Tax Claims.***  Unless a taxing Governmental Unit has asserted a Claim against the Debtor before the Governmental Unit Bar Date or Administrative Expense Claim Bar Date established therefor, no Claim of such Governmental Unit shall be Allowed against the Debtor, the Liquidating Trust, or their respective officers, employees, or agents for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if

any, of the Debtor, any of its Affiliates, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.

## RETENTION OF JURISDICTION

***General Retention.***   Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, until the Bankruptcy Case is closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction of the Bankruptcy Case that is permitted by applicable law, including that necessary to ensure that the purposes and intent of the Plan are carried out.

***Specific Purposes.***   In addition to the general retention of jurisdiction set forth in Article 12 of the Plan, after Confirmation of the Plan and until the Bankruptcy Case is closed, the Bankruptcy Court will retain jurisdiction of the Bankruptcy Case for the specific purposes listed in Article 13 of the Plan.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

### General

The tax consequences of the Plan to the Debtor and to Holders of Claims and Equity Interests are discussed below.   This discussion of the federal income tax consequences of the Plan to the Debtor and Holders under U.S. federal income tax law, including the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), is provided for informational purposes only.   While this discussion addresses certain of the material tax consequences of the Plan, it is not a complete discussion of all such consequences and is subject to substantial uncertainties.   Moreover, the consequences to a Holder may be affected by matters not discussed below (including, without limitation, special rules applicable to certain types of persons, such as persons holding non-vested stock or otherwise subject to special rules, nonresident aliens, life insurance companies, and tax-exempt organizations) and by such Holders' particular tax situations.   In addition, this discussion does not address any state, local, or foreign tax considerations that may be applicable to particular Holders.

**HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.**

**THE DEBTOR'S GENERAL BANKRUPTCY COUNSEL HAS NO TAX EXPERTISE AND HAS NOT RESEARCHED OR ANALYZED TAX CONSEQUENCES RESULTING FROM THE PLAN.**

**SOME OF THE ISSUES DISCUSSED BELOW ARE COMPLEX, AND THERE CAN BE NO ASSURANCE OF THE ACCURACY OF THIS INFORMATION.**

### General Federal Income Tax Consequences to Holders

*In General.*   The following discussion addresses certain of the material consequences of the Plan to Holders.  Under the Plan, the tax consequences of the Plan to a Holder will depend, in part, on the type of consideration received in exchange for the Claim or Equity Interest and the tax status of the Holder, such as whether the Holder is an individual, corporation or other entity, whether the Holder is a resident of the United States, the accounting method of the Holder, and the tax classification of the Holder's particular Claim or Equity Interest.  **HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIM OR EQUITY INTEREST**.

*Tax Consequences to Holders of Claims and Equity Interests.*   The Holders of Claims against and Equity Interests in the Debtor are urged to consult with their tax advisors as to the consequences of the Plan to them.  Among the issues the Holders of Claims and/or Equity Interests and their advisors may wish to consider are:

> (1)      The extent to which the Holder of a Claim and/or Equity Interest is entitled to a bad debt deduction or a worthless securities loss.

> (2)      The extent to which the Holder of a Claim or Equity Interest recognizes gain or loss on the exchange of its Claim or Equity Interest for property, debt, and stock of the Debtor and the character of that gain or loss.

> (3)      The basis and the holding period for any property, debt, and stock received by the Holder of a Claim or Equity Interest.

> (4)      Whether the original issue discount rules, market discount rule, and amortizable bond premium rules apply to any debt received by the Holder of a Claim or Equity Interest.

> (5)      The treatment of property, stock, or debt, if any, received by the Holder of a Claim or Equity Interest in satisfaction of accrued interest.

> (6)      The effect of a Holder of a Claim or Equity Interest receiving a deferred distribution or distribution that is contingent in amount.

### Certain Federal Income Tax Consequences to the Debtors

*Cancellation of Indebtedness Income.*   Generally, cancellation of indebtedness triggers ordinary income to a debtor equal to the adjusted issue price (as determined for federal income tax purposes) of the indebtedness cancelled.  If debt is discharged in a

Chapter 11 case, however, a debtor does not recognize cancellation of indebtedness income. Instead, certain tax attributes otherwise available to the debtor are reduced by the amount of the indebtedness cancelled.  Tax attributes subject to reduction include: (i) net operating losses (NOL) and NOL carryforwards; (ii) most credit carryforwards; (iii) capital losses and carryforwards; (iv) the tax basis of the debtor's depreciable and non-depreciable assets; (v) passive activity loss and credit carryovers; and (vi) foreign tax credit carryforwards.

Under Sections 108(b) and 1017 of the Tax Code, attributes are reduced in the following order: first, net operating loss carryover; second, general business credit carryovers; third, capital loss carryovers; and fourth, tax basis.  In lieu of reducing net operating loss and carryovers, the taxpayer can elect to reduce tax basis first.  Such an election shall not apply to an amount greater than the aggregate adjusted bases of depreciable property held by the taxpayer as of the beginning of the taxable year following the taxable year in which the discharge occurs.

Therefore, any cancellation of indebtedness income realized by the Debtor would require a reduction in their NOLs or other tax attributes.  Because attribute reduction is calculated only after the tax for the year of discharge has been determined, however, the realization of substantial amounts of cancellation of indebtedness income as a result of implementation of the Plan should not diminish the NOLs and NOL carry forwards otherwise available to offset other income recognized in the year in which the Plan is consummated.

Additionally, any sale of the Debtor's assets pursuant to the Plan may result in taxable income to the Debtor if the tax basis in the assets sold is less than the sales price.

The Debtor does not believe that a principal purpose of the Plan is the avoidance of federal income tax within the meaning of Section 269 of the Internal Revenue Code.

### *Importance of Obtaining Professional Tax Assistance*

This discussion is intended only as a summary of certain federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional.  The tax consequences are in many cases uncertain and may vary depending on a Holder's individual circumstances.  Accordingly, Holders are urged to consult with their tax advisors about the federal, state, local and foreign tax consequences of the Plan.

## VOTING ON AND CONFIRMATION OF THE PLAN

### *Confirmation and Acceptance by All Impaired Classes*

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if all of the requirements of Bankruptcy Code Section 1129 are met.  Among the requirements for confirmation of a plan are that the Plan be accepted by all impaired classes of claims and equity interests, and satisfaction of the matters described below.

*Feasibility*.  A plan may be confirmed only if it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor.  The Plan provides for an orderly liquidation of the Debtor's assets and the payment of Allowed Claims, including contingent, unliquidated, and Disputed Claims to the extent they become Allowed Claims, in the order of their priority.  Accordingly, the Plan is *per se* feasible.

The obligations under the Plan to Holders of contingent, unliquidated, and Disputed Claims cannot be ascertained without the determination of the validity and amount of those Claims by the Bankruptcy Court.  Until the Claim determination process is complete, the exact amount to be received by Unsecured Creditors cannot be ascertained.

*Best Interests Standard*.  The Bankruptcy Code requires that the Plan meet the "best interest" test, which requires that members of a Class must receive or retain under the Plan, property having a value not less than the amount which the Class members would have received or retained if the Debtor was liquidated under Chapter 7 on the same date.  The Debtor submits that no funds would be available in a Chapter 7 case for distribution to Creditors after liquidation of the Debtor's assets and payment of the Secured Claims and Allowed Administrative Expense Claims. Accordingly, the Debtor believes that distributions to all Impaired Classes of Claims in accordance with the terms of the Plan would exceed the net distribution that would otherwise take place in Chapter 7 liquidation. The Liquidation Analysis, attached as <u>Exhibit A</u> to this Disclosure Statement, supports this position.

*Confirmation Without Acceptance by All Impaired Classes.*  If one or more of the Impaired Classes of Claims or Equity Interests does not accept the Plan, the Plan may nevertheless be confirmed and be binding upon the non-accepting Impaired Class under the "cram-down" provisions of the Bankruptcy Code, if the Plan does not "discriminate unfairly" and is "fair and equitable" to the non-accepting Impaired Classes under the Plan.

*Discriminate Unfairly*.  The Bankruptcy Code requirement that a plan not "discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank.  The Debtor believes that the Plan does not "discriminate unfairly" with respect to any Class of Claims or Equity Interests because no class is afforded treatment which is disproportionate to the treatment afforded other Classes of equal rank.

*Fair and Equitable Standard*.  The "fair and equitable" standard, also known as the "absolute priority rule," requires that a dissenting class receive full compensation for its allowed claims or interests before any junior class receives any distribution.  The Debtor believes the Plan is fair and equitable to all Classes pursuant to this standard.

With respect to an Impaired Classes of Unsecured Claims that votes against the Plan, Bankruptcy Code Section 1129(b)(2)(B) provides that a plan is "fair and equitable" if it provides that (i) each Holder of a claim of such a class receives or retains on account of such claim, property of a value as of the effective date of the plan equal to the allowed amount of such claim; or (ii) the Holder of any claim or interest that is junior to the claims

of such class will not receive or retain any property under the plan on account of such junior claim or interest.  The Debtor believes that the Plan meets these standards.

The Debtor intends to evaluate the results of the balloting and determine whether to seek Confirmation of the Plan in the event that less than all the Impaired Classes of Claims vote to accept the Plan.  The determination as to whether to seek Confirmation under such circumstances will be announced before or at the Confirmation Hearing.

*Non-Confirmation of the Plan.*  If the Plan is not confirmed by the Bankruptcy Court, the Court may permit the filing of an amended plan, dismiss the cases, or convert the case to Chapter 7.  In a Chapter 7 case, the Debtor's assets would be sold and distributed to the Unsecured Creditors after the payment of all Secured Claims, costs of administration, and the payment of priority claims.

The cost of distributing the Plan and this Disclosure Statement, as well as the costs, if any, of soliciting acceptances, will be borne by the Estate.

### ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the potential alternatives include (a) alternative plans under Chapter 11 (including a liquidation plan), (b) dismissal of the case, or (c) conversion of the case to a case under Chapter 7 of the Bankruptcy Code.

### *Alternative Plans of Reorganization*

If the Plan is not confirmed, the Debtor could attempt to formulate and propose a different plan or plans.  The Debtor believes that the Plan will enable Creditors to be paid the maximum amount possible for their Allowed Claims.

### *Liquidation under Chapter 7 or Chapter 11*

If a plan is not confirmed, the Bankruptcy Case may be converted to a Chapter 7 liquidation case.  In a Chapter 7 case, a trustee would be appointed to liquidate the assets of the Debtor.  Converting the case to Chapter 7 would simply add an additional layer of administrative expenses to the Estate which would eliminate any funds available for distribution to Unsecured Creditors.  The proceeds of the liquidation would be distributed to the Creditors of the Debtor in accordance with the priorities established by the Bankruptcy Code.

In general, the Debtor believes that liquidation under Chapter 7 would result in diminution of the value of the interests of the Creditors because of (a) additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee; (b) additional expenses and claims, some of which might be entitled to priority, which would arise by reason of the liquidation; (c) failure to realize the full value of the Debtor's assets; (d) the inability to utilize the work-product and knowledge of the Debtor and its Professionals; (e) the substantial delay which

would elapse before Creditors would receive any distribution in respect of their Claims; and (f) the loss to Unsecured Creditors.

The Debtor believes that the Plan is superior to liquidation under Chapter 7.

### SUMMARY, RECOMMENDATION AND CONCLUSION

The Plan provides for an orderly and prompt liquidation of the Debtor's assets and distribution to Holders of Allowed Claims against the Debtor.  The Debtor believes that its efforts to maximize return for Creditors have been full and complete.  The Debtor further believes that the Plan is in the best interests of all Creditors.  In the event of a liquidation of the Debtor's assets under Chapter 7 of the Bankruptcy Code, the Debtor believes there would be no distribution to Unsecured Creditors.  For these reasons, the Debtor urges that the Plan is in the best interests of all Creditors and that the Plan be accepted.

*[SIGNATURE PAGE FOLLOWS]*

Tampa, Florida
Dated as of May 24, 2019.

BARKER BOATWORKS, LLC

By: _____

Kevin Barker
Its Manager

/s/ Amy Denton Harris
Amy Denton Harris
Florida Bar No. 634506
STICHTER, RIEDEL, BLAIN & POSTLER, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone: (813) 229-0144
Email: aharris@srbp.com
Counsel for Debtor and Debtor in Possession

**LIQUIDATION ANALYSIS IN CONNECTION WITH DISCLOSURE STATEMENT
FOR PLAN OF LIQUIDATION UNDER CHAPTER 11 OF UNITED STATES
BANKRUPTCY CODE FOR BARKER BOATWORKS, LLC**

| | Chapter 11 Plan Value | Liquidation Value | Note |
|---|---|---|---|
| **Assets** | | | |
| Cash on Hand | $4,698 | $4,698 | 1 |
| Security Deposits | 16,268 | 0 | 2 |
| Raw Materials | 50,000 | 5,000 | 3 |
| Work in Process | 81,000 | 0 | 4 |
| Boat Molds | 850,000 | 510,000 | 5 |
| Office Furniture | 14,919 | 1,500 | 6 |
| Computers | 5,227 | 500 | 7 |
| Software | 2,005 | 0 | 8 |
| Vehicles and Trailers | 51,500 | 38,625 | 9 |
| Machinery and Equipment | 113,175 | 67,905 | 10 |
| Employee Loan | 5,300 | 0 | 11 |
| Action against Yellowfin Yachts, LLC and Wylie Nagler | Unknown | Unknown | 12 |
| **Total Assets** | **$1,194,092** | **$628,228** | |
| | | | |
| **Liabilities** | | | |
| **Administrative Claims** | | | |
| DIP Loan (Admin., Secured) | $1,000,000 | | 13 |
| Professional Fees | 150,000 | | 14 |
| U.S. Trustee Fees | 12,000 | | 15 |
| Estimated Chapter 7 Trustee Fees and Liquidation Costs | 5,000 | | 16 |
| **Total Administrative Claims** | **$1,167,000** | | |
| | | | |
| **Secured Claims** | **38,735** | | 17 |
| **Priority Tax Claims** | **125,000** | | 18 |
| **Priority Claims** | **130,000** | | 19 |
| **General Unsecured Claims** | **3,805,597** | | 20 |
| **Total Claims** | **$5,266,332** | | |

**AMOUNT PAYABLE TO UNSECURED CREDITORS**

# IN CHAPTER 7:      0

**ASSUMPTIONS IN THE PREPARATION OF THE LIQUIDATIONANALYSIS IN CONNECTION WITH DEBTOR'S PLAN OF LIQUIDATION**

1.  This Liquidation Analysis was prepared in accordance with the requirements of §1129 of the Bankruptcy Code to establish that the Plan of Reorganization is in the best interest of each holder of a claim or interest.

2.  The Liquidation Analysis is based upon certain estimates and assumptions that, although developed and considered reasonable by the Debtor, are inherently subject to significant economic factors, market conditions, uncertainties, and contingencies beyond the control of the Debtor. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtor was in fact to undergo such liquidation and actual results could vary materially and adversely from those contained herein. The liquidation and reorganization values represent the Debtor's best estimate of those values based on available information. Where appropriate, the Debtor rounded values to the nearest $1,000.

3.  This analysis assumes the conversion of the current Chapter 11 case to a Chapter 7 case with the liquidation of the Debtor's assets by a Chapter 7 Trustee within a significantly abbreviated timeframe. A Chapter 7 Trustee would be initially appointed by the Bankruptcy Court to administer the estates. The Chapter 7 Trustee is independent and would be entitled to make all of his or her own decisions regarding the liquidation of the estates' assets, the hiring of professionals, the pursuit of claims or litigation and the payment of or objection to claims. The distribution of any ultimate dividend would be made in accordance with the priorities established by the Bankruptcy Code. The Chapter 7 Trustee would be compensated in accordance with the Bankruptcy Code.

4.  The Liquidation Analysis uses the Debtor's unaudited financial information, and other figures estimated by the Debtor's management and professionals.

5.  There can be no assurances made that all of the Debtor's assets will be completely liquidated during the shortened liquidation period in a Chapter 7.

6.  This Liquidation Analysis is the Debtor's best estimate of the net value of assets available to distribution to creditors after deducting amounts owed to the DIP Lender and the value of secured and administrative claims. To the extent the Debtor's estates are comprised of assets that had no value as set forth in the Debtor's bankruptcy schedules, those assets were excluded from this analysis.

7.  This Liquidation Analysis is without prejudice to the Debtor's ability to object to the characterization, amount, secured status or classification of any claim or asset. The Debtor reserves all rights and objections to any filed or scheduled claim, and any application or motion seeking an administrative expense claim. Reference to any filed or scheduled claim or any pleading seeking a claim shall not constitute a waiver of any kind.

**NOTES TO LIQUIDATION ANALYSIS IN CONNECTION WITH
DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF LIQUIDATION**

1.    Cash in the Debtor's bank account as of April 5, 2019.  The Debtor's Cash will fluctuate prior to the Confirmation Hearing.

2.    As of the Petition Date, the Debtor had $15,000 in lease security deposits and $1,268 in utility security deposits.  In the event of a liquidation, the landlords/utility service providers would set-off the deposits against amounts owed by the Debtor.  Accordingly, the Debtor estimates that a Chapter 7 trustee would not realize any value in the event of a liquidation.

3.    As of the Petition Date, the Debtor owned raw materials with a cost of approximately $50,000.  The raw materials are utilized in the manufacturing of custom boats, and most are open and partially used.  The Debtor estimates that a quick sale of the raw materials would result in the Chapter 7 trustee recovering approximately 10% of the original cost, or approximately $5,000.

4.    The Debtor owns the work in process listed on **Exhibit A**.  The work in process is comprised of partially completed component parts for various Barker custom boats.  The Debtor estimates that the work in process has a cost of approximately $81,000.  Since the component parts are custom parts, they have no value in the event of a liquidation.  Accordingly, the Debtor estimates that a Chapter 7 trustee would not realize any value in the event of a liquidation.

5.    The Debtor owns the boat molds listed on **Exhibit A**.  The use of the boat molds is subject to design contracts with Michael Peters Yacht Design, Inc. ("**MPYD**") and royalty fees owed to MPYD.  The Debtor estimates that the molds have a going concern value of approximately $850,000.  The Debtor estimates that a quick sale of the boat molds would result in the Chapter 7 trustee recovering approximately 60% of the going concern value, or approximately $510,000.

6.    The Debtor owns office furniture with a net book value as of November 2018 of approximately $15,000.  The Debtor estimates that a quick sale of the office furniture would result in the Chapter 7 trustee recovering approximately 10% of the net book value, or approximately $1,500.

7.    The Debtor owns computers with a net book value as of November 2018 of approximately $5,000.  The Debtor estimates that a quick sale of the computers would result in the Chapter 7 trustee recovering approximately 10% of the net book value, or approximately $500.

8.    The Debtor owns software with a net book value as of November 2018 of approximately $2,000.  Given the speed with which software becomes outdated, the Debtor does not believe that the Chapter 7 trustee would recover any funds in the event of a liquidation.

9.    The Debtor owns the following vehicles and trailers with an estimated total going concern value of $51,500:

  • 2014 Ford F-250 truck with an estimated going concern value of $20,000
  • 2014 Ford F-150 truck with an estimated going concern value of $13,000
  • Show trailer with a net book value as of November 2018 of approximately $5,500

- 2004 Ford cargo van with an estimated going concern value of $3,000
- Two Ameratrail trailers with an estimated going concern value of approximately $10,000

As of the Petition Date, the F-250 truck was encumbered by a lien in favor of SunTrust Bank of $24,906.82, and the F-150 truck was encumbered by a lien in favor of SunTrust Bank of $13,828.44. The Debtor estimates that a quick sale of the vehicles and trailers would result in the Chapter 7 trustee recovering approximately 75% of the going concern value, or approximately $38,625.

10.    The Debtor owns the machinery and equipment listed on **Exhibit A**. The Debtor estimates that the machinery and equipment has a going concern value of approximately $113,000. The Debtor estimates that a quick sale of the machinery and equipment would result in the Chapter 7 trustee recovering approximately 60% of the going concern value, or approximately $68,000.

11.    Prior to the Petition Date, the Debtor made a loan to a non-insider employee. As of the Petition Date, the balance due on the loan was $5,300. The employee is no longer employed by the Debtor, and the Debtor does not believe that the loan is collectible.

12.    Prior to the Petition Date, the Debtor and Kevin Barker filed a complaint against Yellowfin Yachts, LLC and its principal, Wylie Nagler, for, among other things, defamation, tortious interference with an advantageous business relationship, and breach of contract. The case is styled *Barker Boatworks, LLC and Kevin Barker v. YellowFin Yachts, LLC and Wylie Nagler*, Case No. 2016-CA-000355AX, and is pending in the Circuit Court of the Twelfth Judicial Circuit in and for Manatee County, Florida. Andre Perron and the law firm of Barnes Walker were engaged in 2016 to represent the Debtor and Mr. Barker on a contingency fee basis.

13.    Pursuant to the Court's *Final Order Granting Debtor's Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001* (Doc. No. 56), the Debtor obtained a $1,500,000 debtor in possession financing facility from Strike Force Seven LLC ("**SFS**"). The Debtor anticipates that as of confirmation SFS will have advanced between $700,000 and $1,000,000 under the DIP facility. If the Chapter 11 case is confirmed with SFS as the successful purchaser, the aggregate amount of any advances under the DIP loan facility plus any other DIP loan obligations shall be a component of the purchase price. If the Chapter 11 case is confirmed with an alternative purchaser, the aggregate amount of any advances under the DIP loan facility plus any other DIP loan obligations shall be paid on the Effective Date. In the event of a Chapter 7 liquidation, the proceeds from the liquidation of assets would be payable in accordance with the priority scheme set forth in 11 U.S.C. § 507(a) such that administrative claims would be paid prior to any payment to priority claimants or general unsecured creditors. In addition to having a superpriority administrative expense claim, SFS has a senior secured lien on all of the Debtor's assets. *See* Doc. No. 56.

14.    The Debtor retained Stichter, Riedel, Blain & Postler, P.A. as bankruptcy counsel on an hourly rate basis, Barnes, Walker, Goethe, Hoonhout, Perron & Shea, PLLC as special litigation counsel on a contingency fee basis, and John L. Abitante C.P.A., P.A. as its accountants on an hourly rate basis. The Debtor estimates that it will have accrued approximately $150,000 in professional fees as of confirmation.

15. The Debtor estimates that as of confirmation, it will owe approximately $13,000 in quarterly fees to the United States Trustee's Office for the period of April 5, 2019, through the closure of the case (which the Debtor anticipates will be in July 2019), calculated as follows:

| TOTAL QUARTERLY DISBURSEMENTS | QUARTERLY FEE |
|---|---|
| $0 to $14,999.99 | $325.00 |
| $15,000 to $74,999.99 | $650.00 |
| $75,000 to $149,999.99 | $975.00 |
| $150,000 to $224,999.99 | $1,625.00 |
| $225,000 to $299,999.99 | $1,950.00 |
| $300,000 to $999,999.99 | $4,875.00 |
| $1,000,000 or more | 1% of quarterly disbursements or $250,000, whichever is less |

16. Total disbursements of compensation to a Chapter 7 Trustee would be calculated pursuant to 11 U.S.C. §326 and are computed as follows:

        25% of first $5,000 ($1,250 Maximum)
+       10% of Next $45,000 ($4,500 Maximum)
+        5% of Next $950,000 ($47,500 Maximum)
+        3% of Balance
        **Total Compensation Requested**

The Debtor does not believe that there would be assets available for administration in a Chapter 7. To the extent that funds are available, any disbursements would be based on the calculations above. In addition to the statutory fee to the Chapter 7 trustee, the Debtor anticipates that the administrative costs of a Chapter 7, including preparation of any final tax returns, could be approximately $5,000.

17. Based upon claims filed by SunTrust Bank, subject to any objection to claims as set forth in Assumption No. 7 above.

18. Based upon the scheduled claim of the Florida Department of Revenue, subject to any objection to claims as set forth in Assumption No. 7 above.

19. Based upon bankruptcy Schedule E, subject to any objection to claims as set forth in Assumption No. 7 above.

20. Based upon bankruptcy Schedule F, subject to any objection to claims as set forth in Assumption No. 7 above.

\

## EXHIBIT A TO LIQUIDATION ANALYSIS

| ASSET | VALUE |
|---|---|
| **Boat Molds** | |
| 26 Hull Mold on Hudson Air Turner | |
| 26 Hull Mold on Hudson Air Turner | |
| 26 Bay deck Mold | |
| 26 Open Liner Mold | |
| 26 Open Liner Mold with FWD Seating | |
| 26 Open Ring Deck Mold | |
| 26 Console Mold | |
| 26 Console Headliner Mold | |
| 26 Open leaning Post Mold | |
| 26 Bay leaning Post Mold | |
| 26 "Key West" Hardtop Mold | |
| 26 "Full" Hardtop Mold | |
| 26 Key West "Stand On" Hardtop Mold | |
| 26 Upper Helm Mold | |
| 26 Open/Bay Hatch Molds | |
| 26 Tub Molds | |
| Seachest Mold | |
| **Total Boat Molds** | **$        850,000.00** |
| | |
| **Machinery and Equipment** | |
| Hudson 10 Ton A-Frame | 25,000.00 |
| Yale Forklift | 7,500.00 |
| Forklift Boom | 1,500.00 |
| Atlas Copco Compressor, Dryer, Holding Tank | 12,000.00 |
| MVP Wetout System | 7,500.00 |
| MVP Wetout System | 7,500.00 |
| MVP Gelcoat System | 7,500.00 |
| MVP Pail Rider | 2,500.00 |
| (1) 2qt Pressure Pot | 150.00 |
| (1) Cup Gun | 200.00 |
| (2) Airtech Vacuum Pumps | 6,000.00 |
| (3) Small Vacuum Pumps | 350.00 |
| Resin Holding Tank | 250.00 |

| | |
|---|---|
| (25) Metal storage racks | 2,500.00 |
| (6) Part Carts | 250.00 |
| (6) Ladders | 100.00 |
| (7) Utility Cabinets | 500.00 |
| (2) large Metal Shop Consumable Cabinets | 1,000.00 |
| Lamination table w/Glass Racks | 500.00 |
| (2) Set GoJacks W/Rack | 500.00 |
| (6) Shop Fans | 250.00 |
| (3) Yellow Fireproof Safety Cabinets | 1,500.00 |
| (5) Work Benches | 500.00 |
| (2) Bench Grinders | 150.00 |
| (2) Bench Vises | 500.00 |
| (1) Band Saw | 500.00 |
| (1) Chop Saw | 125.00 |
| (2) Skill Saws | 250.00 |
| (1) Jig Saw | 75.00 |
| (2) Battery Chargers | 450.00 |
| (1) Froth Pac Kit on Dollies | 1,000.00 |
| (3) 2.5 Ton Shop Cranes | 500.00 |
| (13) 100' Air Lines | 250.00 |
| (1) Air Buffer | 250.00 |
| (3) heat Guns | 150.00 |
| (5) DA Air Sanders | 100.00 |
| (4) 90 Degree 3" Grinders | 200.00 |
| (2) 90 Degree 5" Grinders | 100.00 |
| (3) Air Saws | 200.00 |
| (2) Electric Drills Rev | 100.00 |
| (6) 12" Scissors | 100.00 |
| (1) Electric Scissor/Knife Sharpener | 250.00 |
| (1) 220V Heater | 250.00 |
| (1) Grease Gun | 50.00 |
| (1) Electric Grease Gun | 250.00 |
| (3) Staple Guns | 50.00 |
| (2) Diamond Air Cutting Tools | 300.00 |
| (4) Di Grinders | 100.00 |
| (4) Electric Buffers | 1,000.00 |
| (8) Extension Chords 50' | 125.00 |
| (2) Shop Vacs | 100.00 |
| (6) Sets Sawhorses | 100.00 |

| | |
|---|---|
| (1) Pressure Washer | 150.00 |
| (2) 55 Gallon Drum Dollies | 100.00 |
| (2) Handtrucks | 50.00 |
| Assorted Stock room bins/Racks | 2,500.00 |
| (1) Refrigerator | 250.00 |
| 20' Box Trailer | 5,000.00 |
| 5000 Sq Ft Show Flooring | 5,000.00 |
| (4) Hull Dollies | 1,000.00 |
| (2) Bay Deck Dollies | 500.00 |
| (2) Open Liner Dollies | 500.00 |
| Office Computers/Equipment/TV's | 5,000.00 |
| **Total Machinery and Equipment** | **113,175.00** |
| | |
| **Work In Process** | |
| (5)26 Hulls | 45,500.00 |
| (2) 26 Open Liners | 8,000.00 |
| (1) Bay Deck | 8,500.00 |
| (3) 26 Open Decks | 7,500.00 |
| (1) 26 Console | 500.00 |
| (1) Console HeadLiner | 150.00 |
| (1) Console Door | 300.00 |
| (3) Key West Hardtops | 4,500.00 |
| (1) Set Bay Hatches | 5,000.00 |
| (10) 8.8" Speaker Rings | 150.00 |
| (4) 10" Subwoofer Rings | 100.00 |
| (1) Forward Seat | 450.00 |
| (1) Upper Helm | 250.00 |
| (1) Seachest | 100.00 |
| **Total Work in Process** | **81,000.00** |